[S.F. No. 24746. Aug. 27, 1984.]

AMERICAN FEDERATION OF LABOR–CONGRESS OF
INDUSTRIAL ORGANIZATIONS et al., Petitioners, v.
MARCH FONG EU, as Secretary of State, etc., et al., Respondents;
LEWIS K. UHLER, Real Party in Interest.

## COUNSEL

Marsha S. Berzon, Fred H. Altshuler, Michael Rubin, George C. Harris, Altshuler & Berzon and Laurence Gold for Petitioners.

Douglas E. Mirell, Roger M. Witten, Wilmer, Cutler & Pickering, Steven L. Mayer and Howard, Rice, Nemerovski, Canady, Robertson & Falk as Amici Curiae on behalf of Petitioners.

John K. Van de Kamp, Attorney General, and N. Eugene Hill, Assistant Attorney General, for Respondents.

Nielsen, Hodgson, Parrinello & Mueller, John E. Mueller and Marguerite Mary Leoni for Real Party in Interest.

Ronald A. Zumbrun, John H. Findley, Jonathan M. Coupal, Robert A. Destro, Clint Bolick, Maxwell A. Miller, K. Preston Oade, Jr., and E. Robert Wallach as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**BROUSSARD, J.**—This is an original petition for writ of mandate to order respondent Eu, the Secretary of State of the State of California, to refrain

from taking any action, including the expenditure of public funds, to place the proposed Balanced Federal Budget Statutory Initiative on the November 1984 ballot.[1] The principal effect of the proposed initiative would be to compel the California Legislature, on penalty of loss of salary, to apply to Congress to convene a constitutional convention for the limited and singular purpose of proposing an amendment to the United States Constitution requiring a balanced federal budget. If the Legislature fails to act, the Secretary of State is directed to apply directly to Congress on behalf of the people of the State of California.

The Fifth Article to the United States Constitution sets out two alternative methods of proposing constitutional amendments.[2] It provides in relevant part, that "[t]he Congress, whenever two-thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two-thirds of the several States, shall call a Convention for proposing Amendments, which, in either case, shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several States, or by Conventions in three-fourths thereof, as the one or the other Mode of Ratification may be proposed by Congress . . . ."[3]

In the two centuries since the Constitution was promulgated, it has been amended only twenty-six times. Each of those amendments was proposed by the Congress. (All but one were ratified by state legislatures; the Twenty-first Amendment was ratified by state conventions.) Although there have been many efforts to call a constitutional convention to propose amendments, all have failed to secure applications by the legislatures of the necessary two-thirds of the states.[4]

In recent years a number of persons, including the current President, have urged the enactment of a constitutional amendment requiring a balanced federal budget. Numerous bills have been introduced in Congress. Although the Senate on one occasion approved a proposed constitutional amendment

---

[1] The other respondents are Carl Olsen, San Francisco City Clerk, and Jay Patterson, San Francisco Registrar of Voters. Patterson has filed a disclaimer indicating that he does not intend to defend the suit.

[2] For a discussion of the drafting of article V, see Dillinger, *The Recurring Question of the "Limited" Constitutional Convention* (1979) 88 Yale L.J. 1623, 1624-1630.

[3] The remaining language in article V prohibited any amendment barring importation of slaves before 1808, and any amendment depriving a state of equal representation in the senate without its consent.

[4] See Brinkfield, Problems Relating to a Federal Constitutional Convention (1957) (Com. printing, House Judiciary Com., 85th Cong., 1st Sess.) The call for a convention to propose the direct election of senators came within one state of success, and may have induced Congress to submit the Seventeenth Amendment to the states for ratification.

by the necessary two-thirds vote, the measure failed in the House of Representatives; thus the proposed amendment has never been submitted to the states for ratification.

In the meantime, proponents of the amendment attempted to avoid the necessity for congressional approval by resorting to the alternative method of proposing constitutional amendments—a convention called upon application of two-thirds of the states. As of this writing the legislatures in 32 of the necessary 34 states have formally applied to the Congress to call such a convention.[5]

Following this strategy, proponents have regularly introduced resolutions in the California Legislature calling for a convention to propose a balanced budget amendment. The Legislature has held hearings on some of these measures, but it has declined to adopt any resolution calling for a federal constitutional convention. The supporters of the balanced budget amendment now seek to compel action by the California Legislature by popular initiative.[6]

The proposed initiative reads as follows:

"INITIATIVE MEASURE TO BE SUBMITTED DIRECTLY TO THE VOTERS. Section One. (a) The People of the State of California hereby mandate that the California Legislature adopt the following resolution and submit the same to the Congress of the United States under the provisions of Article V of the Constitution of the United States:

"That the Congress of the United States is urged to propose and submit to the several states an amendment to the Constitution of the United States to require, with certain exceptions, that the federal budget be balanced; and

"That application is hereby made to the Congress of the United States, pursuant to Article V of the Constitution of the United States, to call a convention for the sole purpose of proposing an amendment to the Constitution of the United States to require, with certain exceptions, that the federal budget be balanced; and

"If the Congress of the United States proposes an amendment to the Constitution of the United States identical in subject matter to that contained

---

[5]The applications from the several states differ as to the exact content of the proposed amendment and the responsibilities of the proposed convention. It is not clear whether there are currently 32 valid applications pending for a constitutional convention.

[6]Similar initiatives are pending in at least two other states, Montana and Washington.

herein and submits same to the States for ratification, this application shall no longer be of any force and effect; and

"This application shall be deemed null and void, rescinded and of no effect in the event that such convention not be limited to such specific and exclusive purposes; and

"This application constitutes a continuing application in accordance with Article V of the Constitution of the United States until at least two-thirds of the several States have made similar applications pursuant to Article V of the United States Constitution;

"(b) The Secretary of the Senate is hereby directed to transmit copies of this application, upon its adoption by the California Legislature, to the President and Secretary of the United States Senate and the Speaker and Clerk of the House of Representatives of the Congress of the United States.

"Section Two. The following is added to sections 8901 through 8903 and section 9320 of the Government Code and shall modify, amend or control any other laws or regulations of the State of California similar in subject matter, heretofore or hereinafter enacted:

". . . If the California Legislature fails to adopt the resolution set forth in Section One of [this] initiative measure and submit same to the Congress of the United States, as required therein, on or before the end of the twentieth (20th) legislative day after approval by the people of the said initiative measure, or if the legislature adjourns or recesses during the regular session prior to the twentieth (20th) legislative day without adopting said resolution, or having adopted same, repeals, rescinds, nullifies or contradicts said resolution, all payments, compensation, benefits, expenses, perquisites and any other payments to any member of the California Legislature made pursuant to this Section shall be suspended as to each and every legislator until such time as the California Legislature adopts such resolution. . . .

"Section Three. (a) The people of the State of California hereby adopt the resolution set forth in Section One of this initiative measure; and (b) If the California Legislature fails to adopt the resolution set forth in Section One of this initiative measure within forty (40) legislative days of the approval of this initiative measure, the Secretary of State of California shall transmit the resolution adopted pursuant to this Section to the President and Secretary of the United States Senate and the Speaker and Clerk of the House of Representatives of the Congress of the United States.

"Section Four. [Limits legislative amendment of the initiative.]

"Section Five. If any section or subsection of this initiative or the aforementioned resolution shall be held invalid, the remainder of the initiative and the aforementioned resolution, to the extent they can be given effect, or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby, and to this end the provisions of this chapter are severable."

On March 18, 1984, respondent Secretary of State certified that the proposed initiative had received sufficient signatures to appear on the November 1984 ballot. Petitioners, organizations and individual California taxpayers opposed to the initiative,[7] filed an original action in this court for writ of mandamus. We scheduled a special calendar to consider the matter before the ballots were printed for the forthcoming election.

We have concluded that the initiative, to the extent that it applies for a constitutional convention or requires the Legislature to do so, does not conform to article V of the United States Constitution. Article V provides for applications by the "Legislatures of two-thirds of the several States," not by the people through the initiative; it envisions legislators free to vote their best judgment, responsible to their constituents through the electoral process, not puppet legislators coerced or compelled by loss of salary or otherwise to vote in favor of a proposal they may believe unwise.

We also conclude that the measure exceeds the scope of the initiative power under the controlling provisions of the California Constitution (art. II, § 8 and art. IV, § 1). The initiative power is the power to adopt "statutes"[8]—to enact laws—but the crucial provisions of the balanced budget initiative do not adopt a *statute* or enact a law. They adopt, and mandate the Legislature to adopt, a *resolution* which does not change California law and constitutes only one step in a process which might eventually amend the federal Constitution. Such a resolution is not an exercise of legislative power reserved to the people under the California Constitution.

---

[7]Petitioners are: American Federation of Labor–Congress of Industrial Organizations; American Association of University Women, California State Division; American Civil Liberties Union of Northern California; ACLU Foundation of Southern California; American Federation of State, County and Municipal Employees; American Jewish Committee; Americans United for Separation of Church and State; B'nai B'rith International; General Board of Church and Society, United Methodist Church; National Association for the Advancement of Colored People, Inc.; National Conference of Catholic Charities; National Council of La Raza; National Council of Senior Citizens; National Farmers Union; National Organization for Women; Office for Church in Society, United Church of Christ; Service Employees International Union; Edward J. Collins; Virginia Diogo; Rabbi Allen I. Freehling; and Timothy J. Twomey.

[8]The initiative also includes the power to amend the state Constitution. The balanced budget initiative, however, was denominated as an "initiative statute," which requires the signatures of 5 percent of the registered voters. (Cal. Const., art. II, § 8.) An initiative which amends the state Constitution requires the signatures of 8 percent of the voters. (*Id.*)

Real party in interest argues that we should "let the people's voice be heard." Even if the initiative is invalid, he implies, the election will give the voters the opportunity to express their views on the desirability of a balanced budget, and the legislators may respond to the outcome of the election. This argument misunderstands the purpose of the initiative in California. It is not a public opinion poll. It is a method of enacting legislation, and if the proposed measure does not enact legislation, or if it seeks to compel legislative action which the electorate has no power to compel, it should not be on the ballot.

We do not suggest that the voters of California are without a remedy. This is an election year, in which all members of the Assembly and one-half of the state senators are to be chosen. Voters for and voters against the balanced budget proposal have ample opportunity to make their views known to candidates for legislative seats, and the legislators will be able to act on those expressed views in future sessions.

## I. *Propriety of Preelection Review*

One year ago we considered whether to issue a writ of mandamus to enjoin a special election called by the Governor to vote upon a proposed initiative measure redistricting the state Legislature. (*Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658 [194 Cal.Rptr. 781, 669 P.2d 17].) Opponents of the initiative contended that redistricting could occur only once within the decade following a federal census, and thus that the initiative, which proposed a second redistricting within the same 10-year period, exceeded the legislative power reserved by the people. We agreed, and issued mandamus to bar the election.

Our opinion first discussed the propriety of preelection review. We began by reciting the general rule that " 'it is usually more appropriate to review constitutional and other challenges to ballot propositions or initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity. [Citations.]' (*Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 4 [181 Cal.Rptr. 100, 641 P.2d 200].) That principle is a salutary one, and where appropriate we adhere to it." (34 Cal.3d at p. 665.) We then went on, however, to note Justice Mosk's separate opinion in *Brosnahan* v. *Eu, supra.* Justice Mosk had stated that the general rule inhibiting preelection review "applies only to the contention that an initiative is unconstitutional because of its substance. If it is determined that the electorate does not have the power to adopt the proposal in the first instance . . . the measure must be excluded from the ballot." (31 Cal.3d at p. 6.) He cited examples to support this exception: "election officials have been ordered not to place

initiative and referendum proposals on the ballot on the ground that the electorate did not have the power to enact them since they were not legislative in character [citations], the subject was not a municipal affair [citations], or the proposal amounted to a revision of the Constitution rather than an amendment thereto [citation]." (*Id.*)

Our opinion in *Legislature* v. *Deukmejian, supra,* 34 Cal.3d 658 endorsed the standard described by Justice Mosk. "Here," we said, as in those cases cited by Justice Mosk, "the challenge goes to the power of the electorate to adopt the proposal in the first instance. . . . The question raised is, in a sense, jurisdictional." (P. 667.) Since the issue raised by the Legislature challenged the power of the people to enact a second legislative redistricting within a single decade, we concluded that preelection review was proper.[9]

■ The present proceeding likewise challenges the power of the people to adopt the proposed initiative. The petitioners contend that under article V of the United States Constitution, the people have no constitutional authority to apply to the Congress for a constitutional convention, or to mandate their Legislature to submit such an application. They further contend that the proposed initiative is not legislative in character, a well established ground for barring an initiative measure from the ballot (see *Simpson* v. *Hite, supra,* 36 Cal.2d 125, 129-134), and that it does not enact a statute as required by article II, section 8 of the state Constitution.[10] These contentions state proper grounds for preelection review of the proposed balanced budget initiative.[11]

---

[9]The exercise of preelection review in *Legislature* v. *Deukmejian, supra,* 34 Cal.3d 658, was not an unprecedented act. Previous decisions had barred elections on a state initiative measure (*McFadden* v. *Jordan* (1948) 32 Cal.2d 330 [196 P.2d 787]; *Gage* v. *Jordan* (1944) 23 Cal.2d 794 [147 P.2d 387]). Other court decisions have barred elections on local initiatives (e.g., *Simpson* v. *Hite* (1950) 36 Cal.2d 125 [222 P.2d 225]; *Mervynne* v. *Acker* (1961) 189 Cal.App.2d 558 [11 Cal.Rptr. 340]) and referenda (e.g., *Fishman* v. *City of Palo Alto* (1978) 86 Cal.App.3d 506 [150 Cal.Rptr. 326]).

[10]We note also the legal and practical problems which might arise in postelection review. Section 3 of the initiative adopts a resolution applying for a constitutional convention; it is arguable that this adoption is effective immediately (cf. *Dillon* v. *Gloss* (1921) 256 U.S. 368, 376 [65 L.Ed. 994, 997, 41 S.Ct. 510]) and that the validity of that application thereafter is not an issue within the purview of the courts (see *Coleman* v. *Miller* (1939) 307 U.S. 433 [83 L.Ed. 1385, 59 S.Ct. 972, 122 A.L.R. 695]). The provisions of section 2 suspending legislative salaries go into effect 20 legislative days after the election. It would be possible for petitioners to file a petition for mandate and seek a stay within this period. But one usual argument for postelection review—that the court will have more time to consider the issues and decide the case—loses some force when the court will have to act on an application for provisional relief within a very limited time period following the election.

[11]Language in some cases suggests that even if a proposed measure is within the scope of the initiative power, courts retain equitable discretion to examine the measure before the election upon a compelling showing that the substantive provisions of the initiative are clearly invalid. (See *Harnett* v. *County of Sacramento* (1925) 195 Cal. 676, 683 [235 P.

Although real party in interest recites the principles of popular sovereignty which led to the establishment of the initiative and referendum in California, those principles do not disclose any value in putting before the people a measure which they have no power to enact. The presence of an invalid measure on the ballot steals attention, time and money from the numerous valid propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure.

II. *Issues Arising Under Article V of the United States Constitution*

Our discussion of the federal constitutional issues proceeds in three steps. First, we inquire whether the term "Legislatures" as used in article V refers to the representative body elected to enact the laws of the state—in California, the state Senate and Assembly—or to the whole of the state legislative power, including the reserved power of initiative. Our conclusion that it refers only to the representative body makes it clear that the people cannot by initiative apply directly to Congress for a constitutional convention. We then turn to two remaining questions: whether the people by initiative can (a) compel the Legislature to apply to Congress for a constitutional convention or (b) urge Congress to submit a proposed amendment to the states.

 We must first, however, address briefly the contention raised by distinguished amici curiae (former Attorney General Griffin Bell, former Senator Sam Ervin, and Professor John Noonan) that none of the federal constitutional issues raised here is justiciable. They cite *Coleman* v. *Miller* (1939) 307 U.S. 433 [83 L.Ed. 1385, 59 S.Ct. 972, 122 A.L.R. 695], in which the court refused to adjudicate the validity of Kansas' ratification of the proposed Child Labor Amendment. The *Coleman* petitioners first challenged the authority of the lieutenant governor to break a tie vote on ratification; the court divided equally on the justiciability of that issue. They next asserted that having once rejected the amendment, Kansas could not later ratify; the court, relying on the historical precedent of the Fourteenth Amendment,[12] held this to be a political question within the exclusive au-

---

445]; *Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 255 [101 Cal.Rptr. 628]; Note, *The Scope of the Initiative and Referendum in California* (1966) 54 Cal.L.Rev. 1717, 1725-1729.) We did not base our decision to hear the present case before the election upon that doctrine, but instead relied upon the principle that allegations charging that a measure exceeds the initiative power are properly justiciable before election.

[12]On July 20, 1868, the Secretary of State notified the Congress that three-fourths of the states had ratified the Fourteenth Amendment but that two states, Ohio and New Jersey, had subsequently rescinded their ratification. Congress was also aware that three southern states had initially refused to ratify until new state governments were created under congressional reconstruction programs. Congress nevertheless declared the Fourteenth Amendment duly ratified and a part of the Constitution.

thority of the Congress. Finally, petitioners argued that Kansas had not ratified the amendment within a reasonable time after it was submitted to the states. The court reaffirmed *Dillon* v. *Gloss, supra,* 256 U.S. 368, where it said that an amendment must be ratified within a reasonable time, but held that the timeliness of a particular ratification was also a political question entrusted to the Congress. Four concurring justices went further, asserting that "The [amending] process itself is 'political' in its entirety, from submission until an amendment becomes part of the Constitution, and is not subject to judicial guidance, control or interference at any point." (307 U.S. 433, 459 [83 L.Ed. 1385, 1399], conc. opn. of Black, J.)

The political question doctrine has undergone considerable change since *Coleman* v. *Miller.* (See *Powell* v. *McCormack* (1969) 395 U.S. 486 [23 L.Ed.2d 491, 89 S.Ct. 1944]; *Baker* v. *Carr* (1962) 369 U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691].) Judges and commentators have questioned whether *Coleman* v. *Miller* is consistent with the criteria established in these later cases. (See *State of Idaho* v. *Freeman* (D.Idaho 1981) 529 F.Supp. 1107, vacated as moot, 459 U.S. 809 [74 L.Ed. 39, 103 S.Ct. 22]; *Dyer* v. *Blair* (N.D.Ill. 1975) 390 F.Supp. 1291, 1300-1303; Note, *Good Intentions, New Inventions, and Article V Constitutional Conventions* (1979) 58 Tex.L.Rev. 131, 158-162.)

But assuming that *Coleman* v. *Miller* remains controlling authority on the issues it decided—that Congress alone has the power to decide whether a ratification submitted by a state is valid and timely—that holding does not control in the present setting. *Hawke* v. *Smith, No. 1* (1920) 253 U.S. 221 [64 L.Ed. 871, 40 S.Ct. 495, 10 A.L.R. 1504] (discussed at length later in this opinion (*post,* pp. 700-701)), is direct authority for the proposition that a court can remove a proposal from a state election ballot on the ground that it does not conform to article V, and by necessary inference that a court has authority to adjudicate that question. Contrary to the suggestion of amici, the majority opinion in *Coleman* v. *Miller* did not overrule *Hawke* v. *Smith;* it cited the earlier decision favorably on an issue of standing to sue (307 U.S. at pp. 438-449 [83 L.Ed. at pp. 1388-1394]), and never hinted that *Hawke* v. *Smith* decided a nonjusticiable issue.

In *Dyer* v. *Blair, supra,* 390 F.Supp. 1291, Judge Stevens, now a justice of the United States Supreme Court, considered the effect of *Coleman* v. *Miller* upon earlier Supreme Court article V decisions. The issue in that case was whether a state could constitutionally provide that more than a simple majority was required to ratify a constitutional amendment. Rejecting the argument that every aspect of the amending process is a nonjusticiable political question, Judge Stevens stated that "since a majority of the Court refused to accept that position in [*Coleman* v. *Miller*] and since the

Court has on several occasions decided questions arising under article V, even in the face of 'political question' contentions, that argument is not one which a District Court is free to accept." (Pp. 1299-1300.) In deciding questions of federal constitutional law, a state court is equally bound by the controlling Supreme Court decisions.

Judge Stevens went on to consider the question of justiciability in light of *Powell* v. *McCormack, supra,* 395 U.S. 486, *Baker* v. *Carr, supra,* 369 U.S. 186, and the majority opinion in *Coleman* v. *Miller, supra.* He distinguished *Coleman* v. *Miller*; that decision rested on the historical precedent of congressional adjudication of the effect of withdrawing a ratification, and the difficulty of determining what constituted a reasonable time for ratification. Such precedents and problems, he said, had no relevance to the issue in *Dyer* v. *Blair*—and, we must add, are equally irrelevant to the issue in the present case. Judge Stevens observed that "[d]ecision of the question presented requires no more than an interpretation of the Constitution. Such a decision falls squarely within the traditional role of the . . . judiciary. . . . [¶] The mere fact that a court has little or nothing but the language of the Constitution as a guide to its interpretation does not mean that the task of construction is judicially unmanageable." (Pp. 1301-1302.) He then concluded: "We are persuaded that the word 'ratification' as used in article V of the federal Constitution must be interpreted with the kind of consistency that is characteristic of judicial, as opposed to political, decision making." (P. 1303.) We are similarly persuaded that the word "Legislatures" in article V is subject to judicial construction.

Concluding, therefore, that the issues here raised are justiciable, we turn to the task of construing the language of article V. The application clause of that article provides that "[t]he Congress . . . on the Application of the Legislatures of two-thirds of the several States, shall call a Convention for proposing Amendments. . . ." No reported decisions have decided whether the term "Legislatures" in this clause includes the reserved powers of initiative and referendum.[13] The term "Legislatures," however, also appears in the portion of article V which specifies that an amendment becomes "valid to all Intents and Purposes . . . when ratified by the Legislatures of three-

---

[13]Only two decisions have considered the application clause of article V. In *Petuskey* v. *Rampton* (D.Utah 1969) 307 F.Supp. 235, the district judge ruled that a malapportioned state legislature could not apply to Congress for a constitutional convention to propose an amendment overturning the Supreme Court's reapportionment decisions. The Tenth Circuit reversed the judgment on the ground that only a three-judge court would have jurisdiction to enjoin the state from transmitting its application to the Congress. (*Petuskey* v. *Rampton* (10th Cir. 1970) 431 F.2d 378, cert. den., 401 U.S. 913 [27 L.Ed.2d 812, 91 S.Ct. 882].) The second reported decision, *Opinion of the Justices to the Senate* (1977) 373 Mass. 877 [366 N.E.2d 1226], held that a governor could not veto an application by the legislature.

fourths of the several States," and several cases have construed the meaning of "Legislatures" in this provision. We turn to examine these decisions.

Many of the cases, including *Barlotti* v. *Lyons,* (1920) 182 Cal. 575 [189 P. 282], the only California case, concerned the ratification of the Eighteenth Amendment prohibiting the sale of alcohol. When the California Legislature ratified the amendment, Barlotti and other petitioners presented a referendum petition to the registrar of voters. The registrar refused to transmit the petition to the Secretary of State, and petitioners sought mandamus from this court. Our opinion noted two issues: whether the legislative ratification was conclusive under the federal Constitution, and whether the referendum provisions of the state Constitution were intended to apply to resolutions ratifying a constitutional amendment. It addressed only the federal issue, finding it decisive of the case.

Chief Justice Angellotti, for a unanimous court, defined the question narrowly, as "being simply one as to the meaning of the word 'legislatures' as used in the clause 'when ratified by *the legislatures* of three-fourths of the several states' of article V. . . ." (P. 577.) "If by those words was meant the *representative bodies* invested with the law-making power of the several states, which existed at the time of the adoption of the constitution . . . in each of the several states, and which have ever since so existed, as distinguished from the law-making power of the respective states, there is nothing left to discuss, for with that meaning attributed to the term . . . the constitutional provision is so plain and unambiguous as not to admit of different constructions. The situation would then be that the people of the United States, in framing and ratifying the constitution . . ., 'have excluded themselves from any direct or immediate agency in making amendments to it.' " (P. 578.)

The opinion first examined the ordinary meaning of the term. "It certainly is not in consonance with the ordinary acceptation of the term 'legislature' to take it as meaning otherwise than a representative body selected by the people of a state and invested with the power of law-making for the state, whatever be the power reserved to the people themselves to review the action of that body or to initiate and adopt laws." (P. 578.) It then examined the California Constitution, in which the word "legislature" appears frequently, always with the plain meaning of the Senate and Assembly. Even former article IV, section 1, which reserved the right of initiative and referendum, referred to the Senate and Assembly as "The Legislature of the State of California." The opinion reviewed the use of the term in the United States Constitution, observing that in almost all cases it clearly referred to a representative body. Consequently, the court concluded that the term "Legislatures" in article V means "some official body of a state as distin-

guished from the state itself or the people of the state or the whole law-making power of the state." (P. 582.)

Chief Justice Angellotti recognized the argument that direct popular vote is a superior method of ascertaining the popular will. He replied that the argument "is, in the final analysis, based more upon some present day conceptions of what the law in this regard ought to be, than upon the intention of the framers of the constitution *as expressed therein,* and, to our mind, expressed so clearly as to preclude any other conclusion than the one we have reached." (P. 584.) The court accordingly dismissed the petition for mandamus, thereby precluding a referendum election on the ratification of the Eighteenth Amendment.

The courts of Maine and Michigan filed opinions agreeing with *Barlotti* that article V precludes a referendum on the ratification of a constitutional amendment (*Opinion of the Justices* (1919) 118 Me. 544 [107 A. 673, 5 A.L.R. 1412]; *Decher* v. *Secretary of State* (1920) 209 Mich. 565 [177 N.W. 388]), while Arkansas, Colorado, and Oregon reached the same result on state constitutional grounds (*Whittemore* v. *Terral* (1919) 140 Ark. 493 [215 S.W. 686]; *Prior* v. *Noland* (1920) 68 Colo. 263 [188 P. 729]; *Herbring* v. *Brown* (1919) 92 Ore. 176 [180 P. 328].) Ohio and Washington, however, upheld referendum elections. (*Hawke* v. *Smith* (1919) 100 Ohio St. 385 [126 N.E. 400]; *Mullen* v. *Howell* (1919) 107 Wash. 167 [181 P. 920].) The United States Supreme Court selected the Ohio decision for review and, in a unanimous decision, held unconstitutional a provision of the Ohio Constitution which declared that legislative ratification of a federal constitutional amendment was incomplete until approved by popular referendum. (*Hawke* v. *Smith, supra,* 253 U.S. 221.)

The opinion by Justice Day follows the same reasoning as that of our court in *Barlotti.* He first observes that "Both methods of ratification, by legislatures or conventions, call for action by deliberative assemblages representative of the people, which it was assumed would voice the will of the people. . . . [¶] The framers of the Constitution might have adopted a different method. Ratification might have been left to a vote of the people. . . . [However, the] language of the article is plain, and admits of no doubt in its interpretation. It is not the function of courts or legislative bodies, national or state, to alter the method which the Constitution has fixed." (Pp. 226-227 [64 L.Ed. at p. 875].)

According to Justice Day, "The only question really for determination is: What did the framers of the Constitution mean in requiring ratification by '*Legislatures*'? That was not a term of uncertain meaning when incorporated into the Constitution. What it meant when adopted it still means for the

purpose of interpretation. A Legislature was then the representative body which made the laws of the people. The term is often used in the Constitution with this evident meaning. Article I, § 2, prescribes the qualifications of electors of congressmen as those 'requisite for electors of the most numerous branch of the state legislature.' Article I, § 3, provided that senators shall be chosen in each State by the legislature thereof, and this was the method of choosing senators until the adoption of the Seventeenth Amendment which made provision for the election of senators by vote of the people, the electors to have the qualifications requisite for electors of the most numerous branch of the state legislature. That Congress and the States understood that this election by the people was entirely distinct from legislative action is shown by the provision of the amendment giving the legislature of any State the power to authorize the Executive to make temporary appointments until the people shall fill the vacancies by election. It was never suggested, so far as we are aware, that the purpose of making the office of Senator elective by the people could be accomplished by a referendum vote. The necessity of the amendment to accomplish the purpose of popular election is shown in the adoption of the amendment. In Article IV the United States is required to protect every State against domestic violence upon application of the legislature, or of the Executive when the legislature cannot be convened. Article VI requires the members of the several legislatures to be bound by oath, or affirmation, to support the Constitution of the United States. By Article I, § 8, Congress is given exclusive jurisdiction over all places purchased by the consent of the legislature of the State in which the same shall be. Article IV, § 3, provides that no new States shall be carved out of old States without the consent of the legislatures of the States concerned.

"There can be no question that the framers of the Constitution clearly understood and carefully used the terms in which that instrument referred to the action of the legislatures of the States. When they intended that direct action by the people should be had they were no less accurate in the use of apt phraseology to carry out such purpose. The members of the House of Representatives were required to be chosen by the people of the several States. Article I, § 2." (Pp. 227-228 [64 L.Ed. at pp. 875-876].)[14]

Ohio argued that the term "Legislatures" in article V referred to the legislative power of the state, however divided between representative as-

---

[14]Article I, section 4 provides that the manner of electing senators and representatives "in each State shall be determined by the respective legislatures thereof, but that Congress may . . . alter such regulations. . . ." *Davis* v. *Hildebrant* (1916) 241 U.S. 565 [60 L.Ed. 1172, 36 S.Ct. 708], held that Ohio could submit a redistricting proposal to referendum. *Hawke* v. *Smith* distinguished that case on the ground that congressional legislation, enacted pursuant to this article, had granted each state the right to fix congressional districts in the manner provided by the laws thereof, language chosen for the purpose of permitting the initiative and referendum. (See 253 U.S. at pp. 230-231 [64 L.Ed. at p. 877].)

semblies and the people. Justice Day responded that the argument was fallacious, because "ratification by a State of a constitutional amendment is not an act of legislation within the proper sense of the word. . . . [¶] The act of ratification by the State derives its authority from the Federal Constitution to which the State and its people have alike assented." (Pp. 229-230 [64 L.Ed. at p. 876].) The court accordingly reversed the judgment requiring the submission of the ratification to popular referendum.

Many years have passed since *Barlotti* and *Hawke* were filed, but those decisions remain the unquestioned and controlling authority. (See *Opinion of the Justices to the Senate, supra,* 366 N.E.2d 1226.) Thus in 1975, when the California Attorney General was asked whether the voters by initiative could rescind the Legislature's ratification of the Equal Rights Amendment, he cited *Barlotti* and *Hawke,* and replied: "The California electorate cannot effectively rescind the Legislature's ratification by the initiative process because amendments to the federal constitution are not subject to the initiative or referendum process in California." (58 Ops.Cal.Atty.Gen. (1975) 830, 831.)

As we noted earlier, the cited cases refer to the role of the Legislature in ratifying, not in proposing, constitutional amendments. Courts and commentators agree, however, that the term "Legislatures" bears the same meaning throughout article V. The Massachusetts Supreme Judicial Court, in holding that a governor cannot veto an application for a constitutional convention, declared that "[s]ince the word 'Legislatures' in the ratification clause of Art. V does not mean the whole legislative process of the State . . ., we are of the opinion that the word 'Legislatures' in the application clause, likewise, does not mean the whole legislative process." (*Opinion of the Justices, supra,* 366 N.E.2d 1226, 1228.) Senator Ervin, explaining proposed legislation to regulate a constitutional convention, stated that "[c]ertainly the term 'legislature' should have the same meaning in both the application clause and the ratification clause of Article V." (Ervin, *Proposed Legislation to Implement the Convention Method of Amending the Constitution* (1968) 66 Mich.L.Rev. 875, 889; see Bonfield, *Proposing Constitutional Amendments by Convention* (1969) 39 N.D. L.Rev. 659, 665.)

■ We conclude that when article V refers to an application by the "Legislatures" of two-thirds of the states, calling for a constitutional convention, it refers to the representative lawmaking bodies in those states. Any application directly by the people, through their reserved legislative power, would not conform to article V.

Section 3 of the Balanced Budget Initiative states that the people adopt a resolution calling for a constitutional convention, and provides that, if the

Legislature fails to adopt the resolution within 40 legislative days, the Secretary of State shall transmit the resolution so adopted to the Congress. Under the decisions previously discussed, it seems clear that a resolution adopted directly by the people and transmitted to Congress without action by the Legislature would be invalid under article V.

The initiative, however, proposes direct action, bypassing the Legislature, only as a last resort. The thrust of the measure is in the provision mandating the Legislature to adopt a resolution applying for a constitutional convention. ■ The question thus arises whether pro forma action by a state legislature, acting under compulsion of an initiative measure, is sufficient to comply with article V.

The question itself is one of first impression, but a number of decisions offer guidance. The ratification of the Nineteenth Amendment, giving women the right to vote, was challenged on the ground that two state legislatures ratified in violation of state constitutional provisions restricting their freedom of action. The Missouri Constitution provided that the state legislature could not assent to any amendment that would impair the right to local self-government; the Tennessee Constitution provided that the legislature could not act upon any amendment until an election intervened. The Supreme Court rejected the challenge, holding that "[t]he function of a state legislature in ratifying a proposed amendment to the Federal Constitution . . . is a federal function derived from the Federal Constitution; and it transcends any limitations sought to be imposed by the people of a State." (*Leser* v. *Garnett* (1922) 258 U.S. 130, 137 [66 L.Ed. 505, 511, 42 S.Ct. 217]; see also *Trombetta* v. *Florida* (M.D. Fla. 1973) 353 F.Supp. 575; *Walker* v. *Dunn* (Tenn. 1972) 498 S.W.2d 102.) If a state cannot constitutionally prohibit its legislature from proposing or ratifying a constitutional amendment, by implication it cannot compel the legislature to do so.

Two other cases involve advisory initiatives. In 1928 the Massachusetts Supreme Judicial Court was asked to rule upon a proposed initiative requesting the state's congressional delegation to support repeal of the Eighteenth Amendment. The court held that the measure was not a proper initiative on both state and federal grounds, stating, in connection with the latter ground, that "[t]he voters of the several States are excluded by the terms of art. 5 of the Constitution of the United States from participation in the process of its amendment." (*Opinion of the Justices* (1928) 262 Mass. 603, 606 [160 N.E. 439].)

Fifty years later the Nevada Supreme Court considered an initiative advising the state legislature whether to ratify the Equal Rights Amendment. The court distinguished *Hawke* v. *Smith, supra,* 253 U.S. 221, and *Leser*

v. *Garnett, supra,* 258 U.S. 130 on the ground that the proposal "does not concern a binding referendum, nor does it impose a limitation upon the legislature. . . . [T]he legislature may vote for or against ratification, or refrain from voting on ratification at all, without regard to the advisory vote." (*Kimble* v. *Swackhamer* (1978) 94 Nev. 600 [584 P.2d 161, 162].)

When opponents of the Nevada initiative sought a stay from the United States Supreme Court, Justice Rehnquist, sitting as circuit justice, denied the stay with the following order: "Appellants' . . . contention . . . is in my opinion not substantial because of the nonbinding character of the referendum. . . . Under these circumstances . . . reliance [on] . . . *Leser* v. *Garnett* . . . and *Hawke* v. *Smith* . . . is obviously misplaced. . . . I can see no constitutional obstacle to a nonbinding advisory referendum of this sort." (*Kimble* v. *Swackhamer* (1978) 439 U.S. 1385, 1387-1388 [58 L.Ed.2d 225, 228, 99 S.Ct. 51].)

The Massachusetts and Nevada cases squarely disagree on the validity of a nonbinding initiative, but both cases (and especially Justice Rehnquist's order) clearly imply that a binding initiative would offend article V. Real party in interest, however, cites a decision with contrary implications, *In re Opinions of the Justices* (1933) 226 Ala. 565 [148 So. 107]. The Alabama Supreme Court was asked to rule on a proposed statute requiring that delegates to a convention to ratify the Twenty-first Amendment pledge to follow the result of a statewide vote. Quoting *Hawke* v. *Smith, supra,* 253 U.S. 221, 226-227 [64 L.Ed. 871, 875], where the court said the framers of the Constitution "assumed" that legislatures and conventions "would voice the will of the people," the Alabama court reasoned that the function of deliberative bodies in ratifying proposed amendments was merely to ascertain and carry out the popular will. A direct and binding instruction to the delegates, it concluded, would more truly and efficiently fulfill that function.[15]

We question whether the reasoning of the Alabama court applies to the act of a legislature in proposing or ratifying an amendment. The analysis of the federal Constitution set out in *Barlotti* and *Hawke* indicates that the drafters of that document deliberately chose to vest the power of proposal and ratification in state legislatures instead of the people. The framers were, of course, aware of the difference between a representative body and the electorate as a whole; they knew that a legislature is a deliberative body,

---

[15]Real party in interest also cites *In re Opinions of the Justices* (1933) 204 N.C. 806 [172 S.E. 474]. That decision upheld the validity of a proposed bill which would have allowed the voters to decide whether to call a state convention to consider ratification of the Twenty-first Amendment. It does not appear that the delegates to such a convention, if called, were required to vote one way or the other on the ratification.

empowered to conduct hearings, examine evidence, and debate propositions. Its members may be assumed generally to hold views reflecting the popular will, but no one expects legislators to agree with their constituents on every measure coming before that body. Yet, although undoubtedly aware that the views of a deliberative body concerning a proposed amendment might depart from those of a majority of the voters, the framers of the Constitution chose to give the voters no direct role in the amending process; legislatures alone received the power to apply for a national convention, and legislatures or conventions, as Congress chose, the power to ratify amendments.[16]

The only conclusion we can draw from this fact is that the drafters wanted the amending process in the hands of a body with the power to deliberate upon a proposed amendment and, after considering not only the views of the people but the merits of the proposition, to render a considered judgment. A rubber stamp legislature could not fulfill its function under article V of the Constitution.

We conclude that a state may not, by initiative or otherwise, compel its legislators to apply for a constitutional convention, or to refrain from such action. Under article V, the legislators must be free to vote their own considered judgment, being responsible to their constituents through the electoral process. The proposed Balanced Budget Initiative, to the extent that it mandates the California Legislature to apply to Congress for a constitutional convention, violates article V of the United States Constitution.

The resolution set out in section 1 of the initiative includes language which merely petitions Congress to adopt a balanced budget amendment, and does not attempt to invoke the application process of article V. Since that language does not purport to bind Congress or the state Legislature to undertake any act of legal significance under article V, it is analogous to the advisory initiatives discussed earlier in this opinion. (*Ante,* pp. 704-705.) As we there noted, the decisions conflict, with one case (*Opinion of the Justices, supra,* 262 Mass. 603) ruling that an advisory initiative violates article V, but a later decision (*Kimble* v. *Swackhamer, supra,* 584 P.2d 616) upholding such an initiative.

---

[16]It has been argued that the framers of the Constitution considered state conventions to be more representative than state legislatures, and for that reason directed that the ratification of the original Constitution be by conventions. (See discussion in *United States* v. *Sprague* (1931) 282 U.S. 716, 731 [75 L.Ed. 640, 644, 71 A.L.R. 1381].) If so, it is significant that the wording of article V permits Congress to choose between ratification by the more representative convention or the less representative legislature, but permits only the legislature to apply for a national convention.

■ A resolution, whether by the Legislature or by the people, urging Congress to approve a proposed constitutional amendment is not an act of constitutional significance. Such a resolution does not call for a national convention, propose an amendment, or ratify an amendment. We therefore conclude, in accord with *Kimble* v. *Swackhamer,* that such a resolution does not raise any issue under the federal Constitution. It follows that the Balanced Budget Initiative, insofar as it merely adopts a resolution urging Congress to submit a constitutional amendment to the states, and mandates the Legislature to adopt that resolution, does not offend article V.

Our conclusion that the crucial provisions of the initiative measure are invalid under the United States Constitution, but that other, subordinate provisions are not, necessarily raises a question of severability. Since the same question arises in connection with our analysis of the state constitutional issues, we defer discussion of the matter until later in this opinion.

III. *Issues Arising Under the California Constitution*

The Balanced Budget Initiative contains three substantive sections. At the core of the initiative is the resolution set out in section 1, which calls upon Congress to submit a balanced budget amendment, and applies to Congress for a constitutional convention to propose such an amendment. Section 1 then mandates the Legislature to adopt this resolution. Section 2 provides that if the Legislature does not comply within 20 legislative days, the legislators' compensation is suspended. Section 3 provides for adoption of the resolution by the people, and directs the Secretary of State to transmit it to Congress if the Legislature fails to adopt it within 40 legislative days.

Article IV, section 1 of the California Constitution declares that "[t]he legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly, but the people reserve to themselves the powers of initiative and referendum." Article II, section 8, subdivision (a) defines the initiative: "The initiative is the power of the electors to propose *statutes* and amendments to the Constitution and to adopt or reject them." (Italics added.)[17] Article II, section 9 defines the referendum in similar terms; it is "the power of the electors to approve or reject *statutes.*" (Italics added.)

Prior to the 1966 revision of the California Constitution, the relevant provision (then part of art. IV, § 1) reserved to the people the power to propose "laws" (the initiative) or to reject any "acts" passed by the Leg-

---

[17]The phrase "*amendments to the Constitution*" in article II refers to amendments to the state Constitution, and has no application to the present case.

islature (the referendum). The California Constitution Revision Commission selected the term "statutes" as a simpler statement of the reserved power, without a change in meaning. (Cal. Const. Revision Com., Proposed Revision Const. (1966) p. 43.) The 1966 revision also amended article IV, section 15 (now art. IV, § 8, subd. (b)), which had declared in part that "No law shall be passed except by bill"; the new version reads "The Legislature may make no law except by statute and may enact no statute except by bill."[18]

■ The question we face is whether the Balanced Budget Initiative proposes to adopt a "statute" within the meaning of article II of the California Constitution. ■ In resolving this question, we must bear in mind the declared "duty of the courts to jealously guard" the people's right of initiative and referendum. (*Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307]; *Associated Home Builders, Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled." (*Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 563; *Gayle* v. *Hamm, supra,* 25 Cal.App.3d 250, 258; *Associated Home Builders, Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, 591; see *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219 [149 Cal.Rptr. 239, 583 P.2d 1281]; *San Diego Bldg. Contractors Assn.* v. *City Council* (1974) 13 Cal.3d 205, 210, fn. 3 [118 Cal.Rptr. 146, 529 P.2d 570, 72 A.L.R.3d 973], app. dism. 427 U.S. 901 [49 L.Ed.2d 1195, 96 S.Ct. 3184].)

■ Even under the most liberal interpretation, however, the reserved powers of initiative and referendum do not encompass all possible actions of a legislative body. Those powers are limited, under article II, to the adoption or rejection of "statutes." As we shall explain, it does not include a resolution which merely expresses the wishes of the enacting body, whether that expression is purely precatory or serves as one step in a process which may lead to a federal constitutional amendment.

■ A statute declares law; if enacted by the Legislature it must be initiated by a bill (Cal. Const., art. IV, § 8), passed with certain formalities

---

[18]Before the 1966 revision the California Constitution also provided for the "indirect initiative." (See former art. IV, § 1, ¶ 4.) The voters could propose a bill to the Legislature, and if the Legislature failed to enact that bill within 40 days, the matter was resubmitted to the voters for approval or rejection at the next general election. The 1966 Report of the California Constitution Revision Commission recommended deleting this provision, noting that it added an unnecessary step in the initiative process, and as a result was seldom used. (P. 52.)

(*id.*), and presented to the Governor for signature (art. IV, § 10). Resolutions serve, among other purposes, to express the views of the resolving body. (See Mason, *Legislative Bill Drafting* (1926) 14 Cal.L.Rev. 379, 389-391.) A resolution does not require the same formality of enactment, and is not presented to the Governor for approval.[19]

"It is frequently said that the distinction between bills and resolutions is that resolutions are not law. As a generalization this is probably accurate, if by 'law' is meant those legislative actions which operate on all persons in society, and must be enforced by the executive department, and sustained by the judiciary." (1A Sutherland, Statutory Construction (Sands rev. ed. 1972) p. 335.) The writer adds that "In Congress and some of the states joint resolutions enacted with all the formalities of bills operate as law" (*id.*), but states in a footnote that in most states, including California, "specific constitutional provisions prevent a resolution from being treated as a law." (P. 336, fn. 4.)[20]

In *Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605 [150 P. 977], the court applied this distinction to a municipal referendum. It first declared that the referendum under state law applied only to "acts which must be passed in the form of a statute" (p. 609), as distinguished from a joint resolution, and construed the Richmond City Charter to conform to state practice. This language would seem to foreshadow the invalidity of the

---

[19]In one California case, *Mullan* v. *State* (1896) 114 Cal. 578 [46 P. 670], the distinction between a statute and a resolution proved a trap for the litigant. The Legislature, on request of the Governor, had passed a joint resolution authorizing Captain Mullan to negotiate with the federal government for reimbursement of state expenses and claims arising out of the Moduc Indian War. The resolution provided for payment to Captain Mullan of 20 percent of the amount collected, and when payment was not made, Mullan filed suit. Citing article IV, section 15, which then provided that "No law shall be passed except by bill," the court denied his claim. "A mere resolution," it said, "is not a competent method of expressing the legislative will, where that expression is to have the force of law, and bind others than the members of the house or houses adopting it. The fact that it may have been intended to subserve such purpose can make no difference. . . . 'Nothing becomes law simply and solely because men, who possess the legislative power will that it shall be, unless they express their determination to that effect in the mode appointed by the instrument which invests them with power, and under all the forms which that instrument has rendered essential.'" (Pp. 584-585.)

[20]Two opinions of the California Attorney General comment on this matter. In 1943, the Assembly resolved that a government department should undertake a study of the Los Angeles Airport; the department inquired whether it could use certain funds for that purpose. The Attorney General replied "A resolution of a single house of the legislature, or for that matter, a concurrent resolution, does not have the force and effect of law. . . . [An appropriation] can only be accomplished by a regular statute. . . ." (1 Ops.Cal.Atty.Gen. 438, 439 (1943).) Three years later the Attorney General repeated: "The Constitution, with certain exceptions, provides that no law shall be passed except by bill. [Citation.] A resolution merely expresses the views of both branches of the Legislature." (7 Ops.Cal.Atty.Gen. 381, 382 (1946).)

referendum, but the court then looked more closely at the resolution in question. The city council had resolved to accept a gift of land and money, but that gift was conditioned upon the city using the money (and additional city funds) to build a new city hall on the site donated. Viewing this resolution as the equivalent of an ordinance fixing the site of the city hall and appropriating money for its construction—an exercise of legislative power—the court held the resolution subject to referendum. (See pp. 613-615.) In other words, it is the substance, not the label, that controls, and if a "resolution" does enact a law, it is subject to referendum.

The decisions of other states, involving the ratification of the Eighteenth Amendment discussed earlier in this opinion (*ante,* pp. 700-701), addressed the specific question whether a resolution ratifying a constitutional amendment falls within the reserved power of initiative and referendum. (*Barlotti* v. *Lyons, supra,* 182 Cal. 575, the California decision concerning the Eighteenth Amendment, noted but did not decide the question whether a resolution ratifying a constitutional amendment was within the reserved power of referendum.) The majority of decisions, construing state constitutional provisions indistinguishable from the California provision, have concluded that such a resolution is not subject to popular vote.

*Whittemore* v. *Terral, supra,* 140 Ark. 493, held that the word "acts" in the Arkansas Constitution (the same word as in the pre-1966 Cal. Const.) "means an enacted law—a statute." (Pp. 497-498.) The ratification of a proposed constitutional amendment, the court said, is but a step in the enactment of a law; it does not in itself enact a law and is thus not subject to referendum. (P. 499.)

The court also construed the word "acts" in *Prior* v. *Noland, supra,* 68 Colo. 263. "It is only in the sense of a law, a statute, that the term 'act' is used in the initiative and referendum." (P. 267.) Noting that the term is used in connection with "bill"—as it also was in the pre-1966 California provisions—the court stated that "A resolution is not a bill. [Citation.] The distinctions between a bill and a resolution are well defined. . . . 'The concurrent resolution . . . cannot be held to be a law of the state.'" (*Id.*)

In *Decher* v. *Secretary of State, supra,* 209 Mich. 565, the court concluded that "the framers of the [Michigan] Constitution, by the use of the word 'act' . . . had in mind a statute or law passed with the formality required by the Constitution and approved by the governor." (Pp. 576-577.) The act of the state legislature in ratifying a federal constitutional amendment "is not the making of a law or an 'act' as understood in legislative parlance." (P. 577.)

The Maine Supreme Court likewise declared that the resolution ratifying the Eighteenth Amendment was not subject to referendum because it "was neither a public act, a private act nor a resolve having the force of law. It was in no sense legislation." (*Opinion of the Justices, supra,* 118 Me. 544, 550.) Finally, the Oregon Supreme Court, in *Herbring* v. *Brown, supra,* 92 Ore. 176, concluded that "these sections [establishing the initiative and referendum] apply only to proposed laws, and not to legislative resolutions, memorials, and the like." (P. 180.)[21]

Eight years after the Eighteenth Amendment took effect, the Massachusetts Supreme Judicial Court considered whether an initiative requesting the state's congressional delegation to support repeal of that amendment constituted a "proposed law" within the state's initiative power. "The word 'law'," the justices advised, "imports a general rule of conduct with appropriate means for its enforcement declared by some authority possessing sovereign power over the subject; it implies command and not entreaty; it is something different from an ineffectual expression of opinion possessing no sanction to compel observance of the views announced. The text of the proposed law accompanying this initiative petition does not prescribe a general rule of conduct. It merely invites a declaration of opinion by voters on a subject over which the people of the Commonwealth possess no part of the sovereign power." (262 Mass. at p. 605.) The court concluded that the proposal was not within the reserved initiative power.[22]

Thus as of the 1920's, the majority view was that under constitutional provisions such as that in California, the reserved power of initiative and referendum was limited to such measures as constituted the exercise of legislative power to create binding law—the kind of measure that would be introduced by bill, duly passed by both houses of the legislature, and presented to the governor for signature. That reserved power did not extend to the ratification of constitutional amendments, since a state in ratifying an amendment was not asserting legislative power under its own constitution,

---

[21]The only contrary decision came from the Washington Supreme Court. (*Mullen* v. *Howell, supra,* 181 P. 920.) That court reasoned that the argument that the legislature ratified the amendment by resolution and that a resolution was not subject to referendum was self-defeating because under the state constitution the legislature had no power to act except by bill. (This argument assumes that a state legislature's power to ratify a federal constitutional amendment derives from the state constitution and is subject to limitations in the document; *Leser* v. *Garnett, supra,* 258 U.S. 130, held to the contrary.) The Washington court further reasoned that it was not the resolution, but the act of the legislature in adopting it, that was subject to referendum.

[22]The opinion also noted that "[t]he mandate to the Secretary of the Commonwealth . . . to 'transmit copies . . . to each senator and representative in congress from this commonwealth' is subsidiary and incidental to the main purpose of the proposed law; it relates to a matter which standing alone possesses no legal force; it cannot convert into a law something in itself ineffectual." (262 Mass. at p. 606.)

but exercising a power delegated to the state legislatures by article V of the federal Constitution. (See *Leser* v. *Garnett, supra,* 258 U.S. 130, 137 [66 L.Ed. 505, 511].) Neither did that power extend to resolutions which merely declared policy or entreated action, since such enactments did not constitute the exercise of legislative power to create statutory law.[23]

Real party in interest, however, contends that current California practice and decisions permit an initiative which merely declares public policy. He points to Proposition 12 at the 1982 General Election, which endorsed a bilateral freeze on the construction of nuclear weapons and required the Governor to transmit that endorsement to the President and other federal officials. No judicial decision discussed the validity of the Nuclear Freeze Initiative, but real party suggests that policy initiative was justified by two earlier decisions, *Farley* v. *Healey* (1967) 67 Cal.2d 325 [62 Cal.Rptr. 26, 431 P.2d 650], and *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315 [118 Cal.Rptr. 637, 530 P.2d 605].

*Farley* v. *Healey, supra,* involved a San Francisco city initiative which declared city policy favoring an immediate ceasefire in Vietnam and withdrawal of American troops from that country. The San Francisco City Charter defined the right of initiative with unusual breadth: it included the power to adopt "any ordinance, act or other measure which is within the power conferred upon the board of supervisors to enact," and provided that "[a]ny declaration of policy may be submitted to the electors in the manner provided for the submission of ordinances. . . ." (P. 328, quoting S. F. City Charter, § 179.) Consequently, the court rejected the argument that the initiative was invalid because it did not concern a municipal affair. "[B]oards of supervisors and city councils have traditionally made declarations of policy on matters of concern to the community whether or not they had power to effectuate such declarations by binding legislation."

---

[23]The issue in this guise—the distinction between a statute (or an "act," a "law," or a "bill") and a resolution has not arisen since that date. Subsequent cases have concerned the question whether a measure was "legislative," "administrative," or "adjudicative." (See, e.g., *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511 [169 Cal.Rptr. 904, 620 P.2d 565]; *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550 [219 P.2d 457]; *Simpson* v. *Hite, supra,* 36 Cal.2d 125; *Fishman* v. *City of Palo Alto, supra,* 86 Cal.App.3d 506; *O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283]; *Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558.) These cases assert generally that legislative acts "are those which declare a public purpose and make provisions for the ways and means of its accomplishment." (*Fishman* v. *City of Palo Alto, supra,* 86 Cal.App.3d 506, 509; accord, *O'Loane* v. *O'Rourke, supra,* 231 Cal.App.2d 774, 784.) That definition was fashioned to distinguish administrative acts, which "carry out the legislative policies and purposes already declared by the legislative body" (*Fishman* v. *City of Palo Alto, supra,* 86 Cal.App.3d at p. 509). It will serve in the present context, however, because a resolution, as distinct from a statute, is essentially an enactment which only declares a public purpose and does not establish means to accomplish that purpose.

(P. 328.) Thus the proposed declaration of policy, being within the power of the board of supervisors, could be enacted by initiative under the terms of the city charter.

Two later opinions of the California Attorney General indicated that *Farley* v. *Healey* did not state legal principles applicable to California initiatives generally, but was based on the specific language of the San Francisco Charter. In 1973 the voters in Humboldt County proposed to "direct the Board of Supervisors to notify the Congress and the President . . . of our desire to see a terminal date set for the withdrawal of all United States equipment and personnel from South East Asia. . . ." The Attorney General, responding to a request from the Humboldt County Counsel, advised that "[s]uch a measure is not a proper subject for an initiative by the people of a county under the [California] Constitution and general laws for county government" (56 Ops.Cal.Atty.Gen. 61, 62 (1973)) because it did not constitute legislation but instead "requests the adoption of an nonlegislative resolution . . . relating to matters outside the purview of the county government." (*Id.*, at p. 63.) He distinguished *Farley* v. *Healey* on the ground that under the San Francisco Charter an initiative measure did not have to be a legislative act. (P. 64.)

Two years later the Attorney General referred to his earlier opinion. In that opinion, he said, "this office distinguished the language of the San Francisco charter from the definition of 'initiative' in the California Constitution. [Citation.] In determining that local initiatives in general law counties cannot be used for policy declarations, inferentially we indicated that the statewide initiative is not available for such purposes either." (58 Ops.Cal.Atty.Gen. 830, 831, fn. 2 (1975).)

The second case on which proponents rely is *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315. A state initiative, Proposition 21, repealed Education Code sections 5002 and 5003, which directed school districts to eliminate racial imbalance, and added section 1009.6 to prohibit mandatory busing. In upholding the portion of the initiative repealing sections 5002 and 5003, we stated that "the people of California through the initiative process . . . have the power to declare state policy. The repealing provisions of Proposition 21 can conceivably be interpreted as an expression by the people of . . . their preference for a 'neighborhood school policy.'" (P. 330.) The specific provisions upheld, however, did not declare policy except by inference; they simply repealed two specific sections of the Education Code. Whatever policies motivated that repeal, it is clear that Proposition 21 took statutory form.

The cited cases, thus, are consistent with the conclusion we drew earlier—that the function of the initiative under the California Constitution is to enact

(or repeal) statutes. The statute may declare policy as well as provide for its implementation. Indeed it is common for statutes, including initiative statutes, to contain a section which declares policy and provides a guide to the implementation of the substantive provisions of the measure.[24] But an initiative which seeks to do something other than enact a statute—which seeks to render an administrative decision, adjudicate a dispute, or declare by resolution the views of the resolving body—is not within the initiative power reserved by the people.

We now turn to apply this analysis to the Balanced Budget Initiative. Section 1 of the initiative mandates the Legislature to adopt a resolution calling upon Congress to propose a balanced budget amendment, and applying for a constitutional convention to propose such an amendment. This section is in form neither a statute nor a resolution, but a cross between the indirect initiative repealed in 1966 (see fn. 20, *ante*) and a writ of mandamus. The distinction between an initiative which enacts a statute and one which commands the Legislature to do so is a narrow one, but may be constitutionally significant. If the people have the power to enact a measure by initiative, they should do so directly; if the people lack a power entrusted solely to the Legislature, they should not be permitted to circumvent that limitation. In any event, section 1 does not mandate the Legislature to enact a statute, but to adopt a resolution. That resolution is in part a simple declaration of policy, without statutory implementation, and in part a step in a federal process which may eventually lead to amendment of the federal Constitution. It does not create law and thus, under the authorities and analysis we have examined, does not "adopt" a "statute" within the meaning of article II of the California Constitution.

Section 2 of the initiative proposes to amend sections 8901 through 8903 and section 9320 of the Government Code relating to the payment of legislators' salaries. This section takes the form of a statutory enactment and, standing alone, could not be criticized on the ground that it fails to "adopt" a "statute" within the scope of article II.[25] Section 2, however, simply

---

[24]The distinction between a declaration of policy which takes statutory form and one that does not is functional as well as formal. In the former case, the declaration of policy can be cited and relied upon by administrators and courts in the interpretation and application of other statutory provisions. A declaration which merely requests action by Congress, and which relates to a matter beyond the state's legislative jurisdiction, can have no such legal effect.

[25]Section 2 states that if the Legislature fails to adopt the prescribed resolution within 20 legislative days, all payments to legislators shall be suspended until the resolution is adopted. Petitioners claim this section violates three provisions of the California Constitution: (1) article III, section 4, which provides that "salaries of elected state officials may not be reduced during their term of office"; (2) article IV, section 4, which provides that any adjustment in the compensation of members of the Legislature "may not apply until the commencement of the regular session commencing after the next general election following

provides a sanction, suspension of legislators' compensation, which goes into effect only if the Legislature fails to comply with section 1 within 20 legislative days. Consequently if section 1 is invalid, section 2 falls with it; it cannot be severed to obtain independent life.

Finally, section 3, the remaining substantive provision of the initiative, adopts a resolution calling upon Congress to propose a balanced budget amendment, and directs the Secretary of State to apply for a constitutional convention. We previously held that this application is invalid under article V of the federal Constitution. (See *ante* at pp. 703-704.) We now observe, in addition, that the adoption of this resolution under section 3 of the initiative does not constitute the adoption of a "statute," and thus does not fall within the scope of the initiative power under article II.

We therefore conclude that the Balanced Budget Initiative is invalid as a whole because it fails to adopt a statute, and thus does not fall within the reserved initiative power as set out in article II of the California Constitution. We acknowledge the arguments of the proponents that there may be value to permitting the people by direct vote not only to adopt statutes, but also to adopt resolutions, declare policy, and make known their views upon matters of statewide, national, or even international concern. Such initiatives, while not having the force of law, could nevertheless guide the lawmakers in future decisions. Indeed it may well be that the declaration of broad statements of policy is a more suitable use for the initiative than the enactment of detailed and technical statutes. Under the terms of the California Constitution, however, the initiative does not serve those hortatory objectives; it functions instead as a reserved legislative power, a method of enacting statutory law. The present initiative does not conform to that model.

Even if we could uphold a portion of section 3 on the theory that the term "statute" in article II could be liberally construed to include a policy resolution, we would still be impelled to exclude the initiative from the ballot. The most important parts of the initiative, the provisions in section 1 man-

---

enactment of the statute [adjusting the compensation]"; and article IV, section 15, which makes it a felony to seek to "influence the vote or action of a member of the Legislature in the member's legislative capacity by bribery, promise of reward, intimidation, or other dishonest means."

Arguments of this character, which go to the substance of the initiative instead of the people's power to enact the measure, ordinarily would not justify preelection review. Moreover, even if section 2 were found invalid on one of these grounds, section 2 is severable in this respect. We would still face the question whether the people could mandate the Legislature to adopt a resolution calling for a constitutional convention, even if the specified means of enforcement were improper. We have therefore not attempted to analyze in depth or to resolve the substantive issues presented concerning the constitutionality of section 2 of the initiative.

dating legislative action and the part of section 3 applying for a constitutional convention, would still be invalid. Section 2 would be inoperative, since the invalidity of the legislative mandate necessarily implies the invalidity of a salary suspension intended to coerce compliance with that mandate. Under such circumstances, to submit the measure to the voters without redrafting would confuse the electorate and mislead many voters into casting their ballot on the basis of provisions which had already been found invalid. As the court explained in *People's Lobby Inc.* v. *Board of Supervisors* (1973) 30 Cal.App.3d 869, 874 [106 Cal.Rptr. 666],[26] "to order the proposal to be placed on the ballot when only a small part of it could be valid would be using the writ of mandate for the purpose of misleading the voters." (See also *Alexander* v. *Mitchell* (1953) 119 Cal.App.2d 816, 829-830 [260 P.2d 261]; *Bennett* v. *Drullard* (1915) 27 Cal.App. 180, 186-187 [149 P. 368].)[27]

Let a peremptory writ of mandate issue commanding respondents not to take any action, including the expenditure of public funds, to place the proposed Balanced Budget Initiative on the November 6, 1984, General Election ballot. We reserve jurisdiction for the purpose of considering petitioners' request for an award of attorney's fees.

Bird, C. J., Mosk, J., Reynoso, J., and Grodin, J., concurred.

**KAUS, J.**—I agree with the majority that under article V of the United States Constitution as interpreted in the applicable federal precedents the initiative process cannot be used directly to apply for a call of a constitutional convention or indirectly to mandate the California Legislature to so apply. Because the governing federal law so clearly eviscerates the heart of the proposed initiative, I also agree that it is appropriate to remove the matter from the ballot at this time, before additional effort and expense are incurred on an inevitably futile task. I do not believe, however, that it is necessary to determine whether a small portion of the measure—by which the electorate purports simply to urge Congress to propose a balanced budget amendment—would, *standing alone,* be a proper initiative measure un-

---

[26]Disapproved on other grounds in *Associated Home Builders* v. *City of Livermore, supra,* 18 Cal.3d 582, 596, footnote 14.

[27]Our decision in *Santa Barbara Sch. Dist.* v. *Superior Court, supra,* 13 Cal.3d 315, rejected the argument that a different test of severability applies to initiative measures than to ordinary statutes passed by the Legislature. (See p. 332, fn. 7.) That case, however, involved postelection review of an initiative, and used language which left open the test of severability in preelection review. (See *ibid.*) On this matter, we think the timing does make a difference. After the election, no harm ensues if the court upholds a mechanically severable provision of an initiative, even if most of the provisions of the act are invalid. In a preelection opinion, however, it would constitute a deception on the voters for a court to permit a measure to remain on the ballot knowing that most of its provisions, including those provisions which are most likely to excite the interest and attention of the voters, are invalid.

der the California Constitution. Although I am not ready to say that it would not be, it would surely be permitting the tail to wag the dog to find that the possible validity of this minor part of the measure justifies the submission of a largely invalid initiative to the electorate. (See *People's Lobby, Inc.* v. *Board of Supervisors* (1973) 30 Cal.App.3d 869, 874 [106 Cal.Rptr. 666], disapproved on another point in *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; *Alexander* v. *Mitchell* (1953) 119 Cal.App.2d 816, 830 [260 P.2d 261].) Accordingly, I concur in the judgment.

**LUCAS, J.**—I respectfully dissent. The majority, acting both precipitously and prematurely, has once again deprived the sovereign people of their precious initiative right. (See *Legislature* v. *Deukmejian* (1983) 34 Cal.3d 658 [194 Cal.Rptr. 781, 669 P.2d 17] [blocking vote on reapportionment initiative].) In my view, the majority errs in at least *three* separate respects, by (1) selecting this case for *preelection* review, contrary to the well-settled rule favoring the initial exercise of the people's franchise, (2) misinterpreting the federal constitutional provision (U. S. Const., art. V) pertaining to the calling of a constitutional convention "on application of" the state Legislatures, and (3) strictly and narrowly construing the scope of the people's reserved initiative power under California law, contrary to the rule in dozens of prior cases.

I. *Preelection Review*

The dissent of Justice Richardson in the foregoing reapportionment initiative case set forth the pertinent authorities which hold that, in the absence of a showing of "clear invalidity," we should not interfere with a scheduled election on an initiative measure but, instead, we should defer our review until *after* the people have had the opportunity to express their views. (*Legislature* v. *Deukmejian, supra,* 34 Cal.3d at p. 681 [dis. opn.]; see *Brosnahan* v. *Eu* (1982) 31 Cal.3d 1, 4 [186 Cal.Rptr. 30, 651 P.2d 274].) Even "grave doubts" regarding the validity of an initiative do not require preelection review. (*Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 256 [101 Cal.Rptr. 628].)

Our recent preelection review of the 1983 reapportionment initiative was "the first time in 35 years this court has removed from the ballot a qualified initiative measure, thereby preventing the people of California from voting on a subject of great importance to them . . . ." (34 Cal.3d at p. 681 [dis. opn.].) Today's decision, filed *less than one year later,* reflects in my view a disturbing trend of this court to reach out and prematurely decide constitutional issues which might have been rendered entirely moot by the results

of the forthcoming election, and which in any event readily could be addressed *after* the election has been held.

What reason does the majority offer for breaching, once again, the traditional rule of judicial restraint? The majority asserts that "The present proceeding . . . challenges the power of the people to adopt the proposed initiative," supposedly a "proper ground" for preelection review. (*Ante,* p. 696.) Surely, the mere "challenge" to an initiative is not enough to trigger such expedited, accelerated review, for such a challenge could be made in every case. Instead, we must first satisfy ourselves that the initiative is *clearly* invalid, i.e., clearly beyond the people's power to adopt. No such showing is made here.

As I will explain, the people indeed do have the power to direct the Legislature to apply to Congress for a constitutional convention. But even were grave doubts presented regarding the initiative's validity, there are good reasons for deferring our review until after the people have expressed their views and voted upon the measure. As real parties herein point out in one of their briefs, "Participation in the electoral process and ongoing public debate on this important issue will benefit the citizenry and their elected representatives. It will allow citizens to exercise their first amendment rights to express their opinions." The majority's ruling unfortunately terminates abruptly any widespread public debate by California citizens regarding a matter so crucial to their own, and their nation's, financial well being. Might not the Legislature, the Congress and the voters each have welcomed a public airing of this important issue?

In addition, I question the propriety or necessity of the "rush to judgment" exhibited in this case, resulting from the majority's attempt to file its decision before impending election deadlines. Most of the briefing in this case was completed only a few *days* prior to oral argument; we filed today's opinion only a few *days* after hearing that argument. How can this court, already swamped with hundreds of pending cases, expect to reach a reasoned determination of the complex issues presented herein under such adverse circumstances?

Finally, several well respected amici (former Attorney General Griffin Bell, former Senator Sam Ervin, and Professor John Noonan) have raised an additional argument against preelection (or indeed *any*) judicial review which strikes me as quite persuasive: A court, and especially a state court, should not pass upon the essentially *political* question regarding the validity of an application for a constitutional convention pursuant to article V of the federal Constitution. (See *Coleman* v. *Miller* (1939) 307 U.S. 433 [83 L.Ed. 1385, 59 S.Ct. 972, 122 A.L.R. 695] [plurality opn., declining review of

validity of state ratification of constitutional amendment].) Instead, we should defer to *Congress,* the body alone entrusted by the federal Constitution with the responsibility to receive and review such applications. As I indicate in the following part of this opinion, it is quite likely that Congress would conclude that the application is constitutionally valid. What possible harm could result from our deferring to Congress regarding this *federal* question?

## II. *Validity Under Federal Law—The Convention Clause*

Article V of the federal Constitution in pertinent part provides that Congress "*on the application of the Legislatures* of two-thirds of the several States, shall call a convention for proposing amendments" to the Constitution. (Italics added.) Such proposed amendments "shall be valid . . . when ratified by the Legislatures of three-fourths of the several States, or by conventions in three-fourths thereof . . . ." Contrary to the majority herein, the challenged initiative measure is not in conflict with the foregoing constitutional provision. The initiative simply directs *the Legislature* to file the requisite application so that California may be counted as supporting the calling of a constitutional convention. Where is the "clear invalidity" under federal law in that procedure?

Thus, section one, subdivision (a), of the challenged initiative measure recites that "The People of the State of California hereby mandate that the California Legislature adopt the following resolution and submit the same to the Congress . . . ." The resolution which follows urges Congress to propose a balanced budget amendment to the federal Constitution and makes "application" to Congress for the calling of a constitutional convention to consider such an amendment. Assuming that, under *California* law, the initiative process may be used for this purpose (a subject I discuss in part III hereof), what basis exists for holding that the measure contravenes the *federal* constitutional requirements of article V? That article requires an "application" from the Legislature; the challenged measure is designed to provide such an application.

This is not a case where the voters are attempting to abrogate *prior* completed legislative action. (E.g., *Hawke v. Smith* (1920) 253 U.S. 221, 227-230 [64 L.Ed. 871, 875-876, 40 S.Ct. 495, 10 A.L.R. 1504]; *Barlotti v. Lyons* (1920) 182 Cal. 575, 578-584 [189 P. 282].) In both *Hawke* and *Barlotti,* the state Legislatures had *already ratified* the 18th Amendment ("prohibition") by joint resolution. Nevertheless, referendum petitions were thereafter circulated for the purpose of submitting the question to the voters for their approval or rejection. Both courts quite properly held that, under article V of the federal Constitution, the term "Legislature" refers

only to the official representative body or bodies of the various states, rather than to the legislative power itself, as exercised through the referendum. Accordingly, the filing of the joint legislative resolutions *exhausted the ratification process*. As stated in *Hawke*, ratification "is but the expression of the assent of the state to a proposed amendment." (P. 229 [64 L.Ed. at p. 876].) Because article V mandated that such assent be expressed by the "Legislature," the referendum process was deemed inapplicable and incapable of abrogating the *prior* expression of legislative will.

In the present case, in contrast to *Hawke* and *Barlotti,* no attempt is made to "undo" any prior, completed legislative act which already had triggered a federal constitutional process such as calling a convention or ratifying a proposed amendment. Instead, here the initiative process is being used to assure that such an act finally is undertaken by our Legislature. Article V does not purport to prohibit the use of the initiative process as one means of inducing a state legislature to act. Indeed, as the foregoing cases make clear, the sole concern of article V is that the request for a convention call take the form of an application by a state legislature. As previously discussed, that concern is satisfied here.

### III. *Validity Under California Law—The Initiative Process*

Is an initiative measure which directs the state Legislature to apply for a constitutional convention "clearly invalid" under California law? Clearly not. Before confronting that issue, however, we should first review certain fundamental principles which control our disposition. First and foremost, "All political power is inherent in the people. Government is instituted for their protection, security, and benefit, and they have the right to alter or reform it when the public good may require." (Cal. Const., art. II, § 1.) A corollary to this is that "the legislative power of this State is vested in the California Legislature . . ., *but the people reserve to themselves the powers of initiative* and referendum." (*Id.,* art. IV, § 1, italics added.) Finally, "The initiative is the power of the electors to propose statutes and amendments to the Constitution and to adopt or reject them." (*Id.,* art. II, § 8, subd. (a).)

The majority would apply a narrow construction of the scope of the initiative power under the California Constitution. In the majority's view, directing the Legislature to apply for a constitutional convention involves neither a "statute" nor an "amendment" to the state Constitution. But use of such a narrow construction of the people's initiative right is directly contrary to the teachings of prior decisions of this court which require a *liberal* construction favoring the exercise of the initiative power.

Justice Tobriner set forth the applicable principles as follows: "The amendment of the California Constitution in 1911 to provide for the initiative and referendum signifies one of the outstanding achievements of the progressive movement of the early 1900's. Drafted in light of the theory that *all power of government ultimately resides in the people,* the amendment speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them. Declaring it 'the *duty of the courts to jealously guard* this right of the people' (*Martin* v. *Smith* (1959) 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307]), the courts have described the initiative and referendum as articulating '*one of the most precious rights of our democratic process*' (*Mervynne* v. *Acker* [1961] 189 Cal.App.2d 558, 563 [11 Cal.Rptr. 340]). '[I]t has long been our judicial policy to *apply a liberal construction* to this power wherever it is challenged in order that the right be not improperly annulled. *If doubts can reasonably be resolved in favor of the use* of this reserve power, courts will preserve it.' (*Mervynne* v. *Acker, supra,* 189 Cal.App.2d 558, 563-564; *Gayle* v. *Hamm, supra,* 25 Cal.App.3d 250, 258.)" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038], italics added, fns. omitted.)

Since *Associated Home Builders,* we have often followed these admonitions regarding this constitutional right. (See, e.g., *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274] [upholding the "Victims' Bill of Rights" initiative]; *Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 41 [157 Cal.Rptr. 855, 599 P.2d 46] [upholding, in most respects, the Political Reform Act of 1974]; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 219-220, 248 [149 Cal.Rptr. 239, 583 P.2d 1281] [upholding the Jarvis-Gann property tax initiative]; see also *Legislature, supra,* 34 Cal.3d 658, 683 [dis. opn.].)

Under a liberal construction of the "precious" and reserved initiative power, the people clearly would have authority to direct their own representatives in the state Legislature to apply for a constitutional convention. Such an initiative measure reasonably could be deemed a proposal for the adoption of a "statute."

There is no fixed, immutable definition of the term "statute." The term could refer to any formal, written exercise of legislative power, whether or not codified and placed within the California codes. The Code of Civil Procedure defines "statute" as any "written law" other than a constitution. (§ 1897; see also former Cal. Const., art. IV, § 1 [initiative is the power to propose "laws"].) The people's written directive to the Legislature, mandating it to apply for a constitutional convention, certainly would qualify as

a written law, i.e., a statute. Under this interpretation, we do not need to reach the further issue troubling the majority, namely, whether a legislative resolution applying for a constitutional convention is a statute. The statute involved here is the one enacted *by the people,* directing the Legislature to submit that application.

For example, a recent initiative measure in part required the Legislature to adopt provisions implementing the right of crime victims to monetary restitution. (Prop. 8, adopted at the June 1982 Primary Election, now art. I, § 28, subd. (b).) Is not this procedural mandate from the people to the Legislature a "written law"? If so, then in what respects does the initiative measure before us fail to qualify as proposing such a law? Would it have made any difference if our measure had recited that its text would be formally incorporated into a new section of the Government Code? Surely such formalism cannot prevail over the people's right to be heard on matters of grave importance to them. Indeed, our prior cases require us to resolve all doubts in favor of the exercise of the initiative power, especially where the subject matter of the measure is of public interest and concern. (See *Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 330 [118 Cal.Rptr. 637, 530 P.2d 605] [state initiative measure declaring state policy on forced busing]; *Farley* v. *Healey* (1967) 67 Cal.2d 325, 328-329 [62 Cal.Rptr. 26, 431 P.2d 650] [local initiative measure adopting policy favoring immediate ceasefire and withdrawal from Vietnam].) As stated in the *Santa Barbara* case, "The people of California through the initiative process, have the power to declare state policy." (P. 330.) Surely, then, they have the power to direct the Legislature, as their representative, to declare such policy on their behalf.

We should bear in mind that, unlike the limited referendum power, the initiative is not confined by any state constitutional restrictions upon its scope or use. (See Cal. Const., art. II, §§ 8, 9; *Carlson* v. *Cory* (1983) 139 Cal.App.3d 724, 728 [189 Cal.Rptr. 185] [repeal of state inheritance and gift taxes].) As *Carlson* observes, "there is nothing in our state Constitution which prohibits the use of the statutory initiative to repeal tax laws." (P. 731.) Similarly, nothing in the state Constitution forbids use of the initiative to direct the Legislature to apply for a constitutional convention.

In a case upholding the validity of another statewide initiative measure (Prop. 13, adopted June 6, 1978, now Cal. Const., art. XIII A), we acknowledged that the initiative may be viewed as a " '*legislative battering ram*' " aimed at " 'tear[ing] through the exasperating tangle of the traditional legislative procedure and strik[ing] directly toward the desired end.' [Citation.]" (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 228.) Given the numerous rejected or aban-

doned bills aimed at accomplishing the end sought by the initiative measure challenged in this case, the foregoing description seems unusually apt. As in *Amador Valley,* "Although we express neither approval nor disapproval of the [measure] from the standpoint of sound fiscal or social policy" (p. 229), we should uphold it in recognition of the constitutional principle that "All political power is inherent in the people." (Cal. Const., art. II, § 1.) Liberally construed, the initiative power applies here.

## IV. *Severability*

Time constraints do not permit me to explore at length the validity of those additional provisions of the challenged initiative which impose financial sanctions upon the Legislature in the event of its noncompliance, and which requires the Secretary of State to act in lieu of the Legislature should it fail to adopt the resolution within 40 days of voter approval. Suffice it to say that these provisions are entirely severable from, and do not affect the validity of, the provision directing the Legislature to apply for a constitutional convention. (See *In re Blaney* (1947) 30 Cal.2d 643, 655 [184 P.2d 892].)

Indeed, each separate section of the initiative measure is made "severable" by the terms of the measure itself, and if any section or subdivision is held invalid, "the remainder of the initiative . . . shall not be affected thereby." I see no reason why the initiative may not be given effect, at least to the extent it directs the Legislature to apply for a constitutional convention. The distinct and severable questions of proper sanctions or alternative procedures in the event of noncompliance may be decided another day.

For all the foregoing reasons, I would deny the peremptory writ of mandate.

On October 25, 1983, the judgment was modified to read as printed above.