[No. F021785. Fifth Dist. Sept. 28, 1995.]

MEMORIAL HOSPITALS ASSOCIATION, Plaintiff and Respondent, v.
KENNETH RANDOL, as County Clerk and Registrar of Voters, etc., et
al., Defendants, Cross-defendants and Respondents;
NME HOSPITALS, INC., Real Party in Interest, Cross-complainant and
Appellant.

## COUNSEL

Neumiller & Beardslee, Steven A. Herum and Michael D. Daudt for Real Party in Interest, Cross-complainant and Appellant.

Allen, Polgar Proietti and Fagalde, Terri L. Allen and Brian L. McCabe for Plaintiff and Respondent.

No appearance for Defendants, Cross-defendants and Respondents.

## OPINION

**VARTABEDIAN, J.**—The trial court ordered a referendum measure removed from the November 1994 Merced County election ballot. Proponents of the referendum measure appealed and sought a stay in this court to permit the measure to remain on the ballot while the appeal was pending. We denied the stay on August 11, 1994. We now affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

The underlying facts are undisputed. In 1980, the Legislature enacted the Emergency Medical Services System and Prehospital Emergency Medical Care Personnel Act, Health and Safety Code section 1797 et seq. (the EMS Act).[1] (See Stats. 1980, ch. 1260, § 7, pp. 4261-4277.) Pursuant to the EMS Act, respondent Merced County (County) on January 21, 1981, entered into a joint powers agreement with neighboring counties for the purpose of establishing and operating an emergency medical services system.

---

[1]Further statutory references are to the Health and Safety Code unless otherwise noted.

Also acting pursuant to the EMS Act, County withdrew from the regional agreement on July 1, 1993, designating its department of public health as County's emergency medical services agency.

On September 1, 1993, County's board of supervisors (the Board) requested that another body established under the EMS Act, the Emergency Medical Care Committee (EMCC), examine the question of providing air ambulance service for County. The EMCC made several recommendations, including establishment of a large geographic portion of the county as an exclusive operating area (EOA) pursuant to the EMS Act. The EMCC further recommended that Medi-Flight, the air ambulance service of respondent Memorial Hospitals Association (Memorial) in Modesto, be awarded the contract to serve the EOA pursuant to an existing-service or "grandfather" provision of the EMS Act.

The Board conducted a public hearing on the recommendation on February 8, 1994. Representatives of appellant, NME Hospitals, Inc., doing business as Doctors Medical Center (Doctors), also located in Modesto, appeared and objected to establishment of the EOA. They did not contend Medi-Flight was incompetent or that patients taken to Memorial did not receive adequate medical care. Rather, their complaint was that Medi-Flight transported most trauma victims to Memorial and Doctors did not get its "fair share" of airborne patients.

By a three-to-two vote on February 8, 1994, the Board "Accept[ed] the recommendation" of the EMCC and "Authorize[d] the Health Department, serving as the Merced County Emergency Medical Services Agency, to implement the recommendations of the Emergency Medical Care Committee."

Dissatisfied with this resolution of the matter, Doctors circulated a referendum petition calling on the Board to rescind its February 8 action or, in the alternative, to place such rescission before the voters at the November general election. According to Doctors, by March 8, 1994, 7,909 signatures had been collected on the referendum petitions, more than twice the minimum number required for such a petition (3,368). The petitions were presented to respondent Randol, the Merced County Clerk and Registrar of Voters (the Clerk) on March 8.

The Elections Code requires that the county clerk/elections official certify a referendum petition within 30 days after it is filed. (See former Elec. Code, §§ 3707 and 3755, now §§ 9114 and 9146.) As of April 8, 1994, the Clerk had not acted to accept or reject the referendum petition, however. On that

date, Memorial filed a "petition for writ of mandate, prohibition or other appropriate relief and complaint for temporary restraining order and injunction and declaratory relief." It named the Clerk and the Board as respondents/defendants, and named Doctors and related entities as real parties in interest. As amended on April 11, 1994, the petition sought to prevent respondents/defendants from placing the referendum on the ballot. County answered the petition, agreeing the referendum should be removed from the ballot. County counsel instructed the Clerk to take no further action to certify the referendum petitions pending further directions from the court.

On April 22, 1994, Doctors filed a "cross-complaint/petition for writ of mandate." The complaint/petition sought an order that the Board repeal its February 8 action or that the Clerk and the Board take all necessary steps to place the referendum measure on the November 1994 ballot.

Alternative writs were issued on the petition and cross-petition. After responses, answers and points and authorities were filed, the trial court heard the matter on May 9, 1994. The court granted the petition for writ of mandate and ordered the referendum measure off the ballot; the court denied the cross-petition. Judgment was entered May 18, 1994, and a preemptory writ issued that same day. Doctors timely filed its notice of appeal on June 10, 1994.[2]

---

[2]Doctors, the appellant, is neither an elector nor a taxpayer of County. No party raised the issue of standing in the court below or in initial briefing before us. (Cf. *City of Irvine* v. *Irvine Citizens Against Overdevelopment* (1994) 25 Cal.App.4th 868, 874 [30 Cal.Rptr.2d 797].)

We requested supplemental briefing on the issue, citing *People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910 [83 Cal.Rptr. 670, 464 P.2d 126]. " 'In general, California courts have no power in mandamus or otherwise to render advisory opinions or give declaratory relief.' (*Municipal Court* v. *Superior Court* (*Swenson*) [(1988]) 202 Cal.App.3d [957, 961], citing *People* ex rel. *Lynch* v. *Superior Court* (1970) 1 Cal.3d 910, 912 . . . , and *Carsten* v. *Psychology Examining Com.* (1980) 27 Cal.3d 793, 798 . . . .)" (*Municipal Court* v. *Superior Court* (*Gonzalez*) (1993) 5 Cal.4th 1126, 1132 [22 Cal.Rptr.2d 504, 857 P.2d 325].)

Nevertheless, the court has discretion to address an issue of great importance, particularly when the matter has been fully litigated below, thoroughly briefed on the merits, and the parties desire resolution of the issues. (*Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 454 [279 Cal.Rptr. 834, 807 P.2d 1063].) In this regard, we note that County respondents have not responded to the court's inquiry concerning standing, although respondent Memorial replied by objecting to appellant's standing. (See *Municipal Court* v. *Superior Court* (*Gonzalez*), *supra*, 5 Cal.4th at p. 1132.)

In this case, County has a clear public duty to place lawful referendum measures on the ballot. We conclude Doctors' financial interest as a potential health care provider in Merced County assures a sufficient stake in the outcome of the litigation to ensure a truly adversarial proceeding. Since the relief sought by Doctors is to procure the enforcement of a public right, we will address the merits of Doctors' contention that County has a public duty to place the referendum measure on the ballot. (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d

DISCUSSION

*Standard of Review*

In *Save Stanislaus Area Farm Economy* v. *Board of Supervisors* (1993) 13 Cal.App.4th 141 [16 Cal.Rptr.2d 408] (*Save Stanislaus*), we considered the appropriate standards for removal of an initiative or referendum measure from the ballot before the voters are permitted to vote on the measure. We held that the trial court should give "great deference to the electorate's constitutional right to enact [or repeal] laws through the initiative [and referendum] process; a court will remove an initiative [or referendum] from the ballot only 'on a compelling showing that a proper case has been established for interfering.' [Citation.]" (*Id.* at p. 150.)

We also noted that the trial court has discretion whether to entertain a preelection challenge to a ballot measure, and that we review the trial court's action for abuse of discretion. (*Save Stanislaus, supra*, 13 Cal.App.4th at p. 150.)

In *Save Stanislaus*, the trial court had allowed the ballot measure to be presented to the voters; in other words, it granted a preemptory writ compelling the board of supervisors to place the measure on the ballot. Our holding that a duly certified ballot measure should be presented to the voters unless there was a "compelling showing" to the contrary was a pragmatic one. Initiative and referendum measures usually arise from controversial or unpopular local government action. There is usually insufficient time for full appellate consideration of a ballot measure before the election. As a result, the unilateral decision by local government officials to keep a measure off the ballot effectively may thwart the initiative/referendum process, unless trial courts vigilantly protect the process by allowing the election to go forward except when the invalidity of the measure "is clear beyond a doubt." (*Gayle* v. *Hamm* (1972) 25 Cal.App.3d 250, 258 [101 Cal.Rptr. 628].)

■ In the present case, unlike *Save Stanislaus*, the trial court removed the referendum from the ballot. We declined to stay the trial court's orders, and election day has long since passed. Our present consideration of the matter is not constrained by approaching election deadlines.

Nevertheless, Doctors contends we should review the trial court's decision using the preelection "compelling showing" standard. We disagree. That standard only seeks to preserve the rights of the electorate until full judicial

---

432, 439 [261 Cal.Rptr. 574, 777 P.2d 610]; *Green* v. *Obledo* (1981) 29 Cal.3d 126, 144-145 [172 Cal.Rptr. 206, 624 P.2d 256].)

consideration of the legality of an initiative or referendum measure in an appropriate action challenging the legality of the adopted initiative or referendum. Once our consideration is postelection, whether we are confronted with a victorious measure or one that never made the ballot in the first place, we simply determine whether, as a matter of law, the ballot measure is valid. (See *Citizens for Responsible Behavior* v. *Superior Court* (1991) 1 Cal.App.4th 1013, 1022 [2 Cal.Rptr.2d 648].)

## The Merits

Doctors asserts two reasons why we should reverse the judgment and permit the referendum measure to appear on the ballot at a future election. First, it says the Board's action on February 8 constituted legislative establishment of an EOA, and that such action can be repealed by referendum. Second, Doctors says that even if the Board did not establish an EOA directly, it legislatively established the policy criteria for such a zone, and that legislative policy can be repealed by referendum. Neither contention is correct.

### A. *The Statutory Framework.*

Consideration of Doctors' contentions requires that we digress to describe in some detail the structure established by the EMS Act. The EMS Act seeks to accomplish several interrelated goals, not all of which are relevant to the present case. (See §§ 1797.1-1797.7.) In addition to standardizing the certification process for paramedics and emergency medical technicians, the EMS Act seeks "to promote the development, accessibility, and provision of emergency medical services to the people of the State of California." (§ 1797.5) "It is the policy of the State of California to ensure the provision of effective and efficient emergency medical care." (§ 1797.6, subd. (a).)

In order to accomplish these goals, the EMS Act establishes a statewide Emergency Medical Services Authority (the Authority). (§ 1797.100.) The director of the Authority shall be a licensed physician. (§ 1797.101.)

The EMS Act also provides that "Each county may develop an emergency medical services program." (§ 1797.200.) If a county elects to develop an EMS program, it must designate a local EMS agency (the local agency). This can be a separate county entity, the county health department, a private services administrator, or a regional joint powers agency. (§ 1797.200.) In the present case, the local agency is the county health department. Each local agency is required to employ a physician as its medical director, and such physician must have "substantial experience in the practice of emergency

medicine [unless that] requirement places an undue hardship on the county or counties." (§ 1797.202, subd. (a).)

The local agency is required to "plan, implement, and evaluate an emergency medical services system . . . consisting of an organized pattern of readiness and response services based on public and private agreements and operational procedures." (§ 1797.204.) The local agency may submit the plan to the Authority for approval. (§ 1797.250.) Among the mandatory subjects of the local EMS plan is transportation of emergency medical patients. (§§ 1797.76, 1797.103, subd. (c), 1797.70, 1797.72.)

Regulation of the right to provide services in a given geographical area can promote the public's access to emergency medical transportation services. In 1983, the EMS Act was amended to permit a "county, upon the recommendation of [the] local EMS agency" to "adopt ordinances governing the transport of a patient who is receiving care in the field from prehospital emergency medical personnel . . . ." (§ 1797.222.)[3]

In an effort to further assure provision of emergency services, the Legislature also enacted in 1983 a requirement that each county establish an EMCC. (Stats. 1983, ch. 1246, § 35, pp. 4906-4907 adding § 1797.270.)[4] The EMCC, appointed by the board of supervisors (§ 1797.272), must review annually the emergency medical care offered within the county, including ambulance services. (§ 1797.274.) Its findings must be reported to the Authority and the local agency. (§ 1797.276.) In addition, the EMCC "shall submit its observations and recommendations to the county board [of supervisors] . . . on all matters relating to emergency medical services as directed by the board . . . ." (§ 1797.276.)

In some circumstances, provision of emergency services is best assured by awarding a provider the exclusive right to serve a particular area. In 1984, the Legislature perceived a threat to the ability of local governments to provide for services, including ambulance services, in this manner. The perceived threat was the holding in *Community Communications Co., Inc. v. City of Boulder* (1982) 455 U.S. 40 [70 L.Ed.2d 810, 102 S.Ct. 835]. That case, involving cable television franchises, held that local government action was not immunized from federal antitrust liability under the "state action"

---

[3]Chapter 9.44, County Ordinances, extensively regulates ambulance service. Section 9.44.030 establishes the health department as the local EMS agency. Section 9.44.042(A) provides, in part: "[T]he local EMS agency shall . . . designate one or more . . . exclusive operating areas (hereinafter EOAs) within the County wherein all ambulance operations are restricted to one provider thereof."

[4]In 1993, section 1797.270 was amended to make establishment of the EMCC discretionary. (See Stats. 1993, ch. 64, § 7.)

doctrine unless the local government's action was to implement a "clearly articulated or affirmatively expressed state policy." (*Id.* at p. 55 [70 L.Ed.2d at p. 821].)

In order to ensure the ability of local governments to limit service providers within a given geographical area, the Legislature in 1984 enacted chapter 1349, Statutes of 1984, creating sections 1797.6, 1797.85 and 1797.224. "It is the intent of the Legislature in enacting this section and Sections 1797.85 and 1797.224 to prescribe and exercise the degree of state direction and supervision over emergency medical services as will provide for state action immunity [pursuant to *Community Communications*] under federal antitrust laws for activities undertaken by local governmental entities in carrying out their prescribed functions under [the EMS Act]." (§ 1797.6, subd. (b).)

Section 1797.224 provides, in relevant part, "A local EMS agency may create one or more [EOA] in the development of a local [EMS] plan . . . ."[5] An EOA is defined as "an EMS area . . . for which a local EMS agency, upon the recommendation of a county, restricts operations to one or more emergency ambulance services . . . ." (§ 1797.85.)

We will now put the foregoing statutory provisions into the context of the present case: the Board directed the EMCC to examine the issue of air ambulance service for County. (§ 1797.276.) The EMCC recommended creation of a large EOA (§ 1797.85) that would be serviced exclusively by Medi-Flight, pursuant to the "grandfather" clause of section 1797.224, without a competitive bidding process.[6] The Board then recommended this action to the local agency (§ 1797.85) and directed the local agency to return to the Board for approval of any contract negotiated with Medi-Flight for such services.

---

[5]Section 1797.224 provides in full: "A local EMS agency may create one or more [EOA's] in the development of a local plan, if a competitive process is utilized to select the provider or providers of the services pursuant to the plan. No competitive process is required if the local EMS agency develops or implements a local plan that continues the use of existing providers operating within a local EMS area in the manner and scope in which the services have been provided without interruption since January 1, 1981. A local EMS agency which elects to create one or more [EOA's] in the development of a local plan shall develop and submit for approval to the authority, as part of the local EMS plan, its competitive process for selecting providers and determining the scope of their operations. This plan shall include provisions for a competitive process held at periodic intervals. Nothing in this section supersedes Section 1797.201."

[6]See footnote 5, *ante.*

## B. *The Board Did Not Create an EOA.*

 The foregoing detailed discussion of the statutory framework of the Board's February 8 action demonstrates the false premise underlying Doctors' first argument in this appeal, namely, that the Board's action constituted legislative enactment of an EOA. The Board is not authorized by statute to establish an EOA; only the local agency can do so.

The EMS Act unequivocally establishes that only the local agency can establish an EOA. Not only does section 1797.224 expressly provide that "a local EMS agency" may create such areas, but in the very definition of "exclusive operating area" the EMS Act provides that it is an area "for which a local EMS agency . . . restricts operations to one or more emergency ambulance services . . . ." (§ 1797.85.) It is apparent that, by requiring the EOA decision to be made by the local agency, which is in turn required to have a physician as its medical director, the Legislature sought to make the EOA decision a professional, not a political, determination.

Doctors contends in the present case, regardless of the statutory framework, the Board actually and directly established an EOA. Doctors urges us to look at the language used by the Board on February 8 and that by the director of the local agency in his presentation to the Board; assertedly, the agency acted as if it had no authority to exercise its discretion after the Board's "recommendation." Doctors says that, because the local agency is the county health department and is obviously under the complete control of the Board, the agency cannot exercise independent discretion in establishing an EOA. However, even if we assume the agency acted as if it had little or no discretion to reach a decision at variance with the Board's recommendation, the context of the issue before us is statutory authority.

 The purpose of a referendum is to repeal a lawful enactment by the local governing body; the purpose of an initiative is to enact laws the local governing body could enact. (See *DeVita* v. *County of Napa* (1995) 9 Cal.4th 763, 775 [38 Cal.Rptr.2d 699, 889 P.2d 1019] [". . . the local electorate's right to initiative and referendum . . . is generally co-extensive with the legislative power of the local governing body"].) The referendum power does not permit the establishment of a "jury" of the electorate to pass on the *legality* of the governing body's action; rather, referendum permits the establishment of a "legislature" of the entire electorate to pass upon the *wisdom* of action lawfully taken by the governing body.

Accordingly, if a board of supervisors impermissibly usurps the powers of a local agency and actually adopts an EOA, that action properly could be

challenged in legal proceedings, not in a referendum. If a local agency failed to actually exercise its statutory discretion, instead blindly approving the EOA recommendation of a board of supervisors, a petition for writ of mandamus, not petitions for a referendum, would be appropriate. (Cf. *Western Oil & Gas Assn.* v. *Air Resources Board* (1984) 37 Cal.3d 502, 511 [208 Cal.Rptr. 850, 691 P.2d 606].) And if a local agency awarded an EOA pursuant to the existing-service or "grandfather" provisions of section 1797.224 under circumstances violative of that section, a taxpayer or an excluded competitor might well have a cause of action, but neither would be entitled to address the issue through referendum. (Cf. *City of Petaluma* v. *County of Sonoma* (1993) 12 Cal.App.4th 1239 [15 Cal.Rptr.2d 617].) Simply put, unlawful action is addressed in the courts, not in the voting booth.[7] (See generally, Cal. Const., art. VI, § 1.)

Doctors also argues the statutory scheme contemplates binding action when the county recommends formation of an EOA. Doctors cites *Western Oil & Gas Assn.* v. *Air Resources Board, supra*, 37 Cal.3d at page 511, for the proposition that a "recommendation" made pursuant to statutory authority may be binding. There, the Air Resources Board was required to consider "a long list" of factors, including "health effects," in establishing certain emission standards. (*Id.* at p. 511.) Pursuant to statute, standards relating to health effects were to be "based upon the recommendations" of the state health department. (*Id.* at p. 506.)

In considering a challenge to emission standards adopted by the Air Resources Board, the Supreme Court looked at the history of the statutes involved and the relative expertise of the Air Resources Board and the health department. It concluded that, as to health effects, the board was bound by the health department recommendation, but that the board was to exercise discretion as to the remaining considerations in setting an emission standard. (37 Cal.3d at p. 512.)

Thus, in *Western Oil*, the court found the Legislature had vested a limited authority to make a highly specialized decision in a body (the health department) with a high level of expertise in the area. Although the Air Resources Board was required to accept the health department's "recommendation" as to health effects, the board still had broad discretion in setting the ultimate emission standard. (37 Cal.3d at p. 512.)

In the present case, by contrast, Doctors proposes that the Legislature intended to invest the Board, a body with no medical expertise, with the full

---

[7]We are not confronted in this case with questions about the exact nature of the "recommendation" relationship between the Board and the local EMS agency. Accordingly, we intimate no views on that subject.

power to establish an EOA, contained in a binding "recommendation" to the local EMS agency. Doctors ignores the fact that this interpretation of the EMS Act would strip from the local agency—the entity with the relevant professional expertise (§ 1797.202)—all discretion in the establishment of an EOA.[8] Common sense and the plain language of the EMS Act cause us to reject Doctors' argument. (Cf. *DeVita* v. *County of Napa*, *supra*, 9 Cal.4th at p. 773, fn. 3.)

## C. *The "Recommendation" Is Not Legislative Action Subject to Repeal by Referendum.*

■ Doctors argues in the alternative that the Board's February 8 action, even if construed as merely a permissive "recommendation," constitutes legislative action that is the proper subject of a referendum. Once again, we disagree.

Mere advisory action by the local governing body is beyond the reach of the referendum process. In *American Federation of Labor* v. *Eu* (1984) 36 Cal.3d 687 [206 Cal.Rptr. 89, 686 P.2d 609], proponents of a federal balanced budget amendment had collected sufficient signatures to place on the ballot an initiative directing the Legislature to apply to Congress to call a constitutional convention for the purpose of considering such an amendment. Opponents of the initiative petitioned the California Supreme Court for a writ of mandamus directing the Secretary of State to omit the initiative from the ballot. (*Id.* at p. 694.)

The court granted the petition: "The initiative power is the power to adopt 'statutes'—to enact laws—but the crucial provisions of the balanced budget initiative do not adopt a *statute* or enact a law. They adopt, and mandate the Legislature to adopt, a *resolution* which does not change California law and constitutes only one step in a process which might eventually amend the federal Constitution. Such a resolution is not an exercise of legislative power reserved to the people under the California Constitution." (36 Cal.3d at p. 694, fn. omitted, italics in original.) Similarly, Doctors in this case does not seek to repeal any local ordinance.

---

[8] Appellant also fails to explain why the use of "recommendation" in section 1797.85 should differ so dramatically from the use of "recommendations" in section 1797.276, where it clearly has an "advisory" connotation: "Every emergency medical care committee shall, at least annually, report to the authority, and the local EMS agency its observations and recommendations relative to its review of the ambulance services, emergency medical care, and first aid practices [etc.] . . . . [The EMCC] shall submit its observations and recommendations to the county board . . . and shall act in an advisory capacity to the county board . . . and to the local EMS agency, on all matters relating to emergency medical services as directed by the board . . . of supervisors." (§ 1797.276.)

Even if, in general terms, a referendum were permitted to repeal a mere "recommendation," this would not be the circumstances in which such action would be permitted. Such an action here would permit the electorate to accomplish indirectly what it could not accomplish directly. Where the Legislature has enacted a statewide policy and has assigned to a particular local body the duty to implement that policy, the Legislature thereby places implementation of the statewide policy beyond the reach of initiative and referendum. (*Committee of Seven Thousand* v. *Superior Court* (1988) 45 Cal.3d 491, 511 [247 Cal.Rptr. 362, 754 P.2d 708]; see also *DeVita* v. *County of Napa*, *supra*, 9 Cal.4th at p. 776.)

As we have previously set forth herein, the Legislature expressly declared statewide policy in sections 1797.5 and 1797.6.[9] Further, the Legislature specifically delegated both the overall creation of EMS plans (§ 1797.204) and the creation of EOA's (§ 1797.224) to the local agency. The Legislature also specifically required that the local agency be staffed in a manner that would ensure its special expertise to make the decisions entrusted to it. (§ 1797.202.) In these circumstances, even if we were to assume "recommendation" of an EOA constitutes legislative action, the strong indication of the Legislature's intent to remove EMS planning and implementation from the initiative and referendum process overcomes the presumption that local legislative decisions are subject to initiative and referendum. (See *DeVita* v. *County of Napa*, *supra*, 9 Cal.4th at p. 776.)

Permitting the voters to rescind the Board's recommendation of an EOA would be tantamount to allowing a referendum on the EOA itself. We have found, however, a clear legislative intent to isolate the EOA process from the political will of the electorate. Thus the present case is unlike *Yost* v. *Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152]. In that case, the local government was required to adopt a local coastal plan and submit it to the California Coastal Commission for approval. However, the local government retained wide discretion in adopting the plan, and the commission "perform[ed] a judicial function when it reviews a local government's [plan]—it determines whether the [plan] meets the minimum [statutory] standards . . . ." (*Id.* at p. 572.) As we have seen, the EMS Act does not give the local EMS agency merely the power to approve or disapprove an EOA; instead, it vests discretion to adopt the EOA in the first instance in the local agency.

The Supreme Court has specifically recognized that the Legislature conceives land-use planning as legislative action—part of the political process

---

[9]While it is true that the EMS Act does not require, but instead permits, formulation of a local EMS plan, the EMS Act does require that such EMS planning, when voluntarily undertaken, must be done by prescribed agencies in a prescribed manner.

—and not as "something distinct from the local legislative function, to be performed by an apolitical planning commission." (*DeVita* v. *County of Napa*, *supra*, 9 Cal.4th at p. 773, fn. 3.) In the present case, we reach the opposite conclusion: the planning and implementation of a local EMS plan has been legislatively entrusted to health care professionals. As such, it is not properly the subject, directly or indirectly, of the initiative and referendum process. (See *Yost* v. *Thomas*, *supra*, 36 Cal.3d at p. 570.)

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to respondents.

Ardaiz, P. J., and Buckley, J., concurred.