A–1 AMBULANCE SERVICE, INC.,
a California corporation,
Plaintiff–Appellee,

v.

COUNTY OF MONTEREY,
Defendant–Appellant.

A–1 AMBULANCE SERVICE, INC.,
a California corporation,
Plaintiff–Appellant,

v.

COUNTY OF MONTEREY; City of
Salinas, Defendants–Appellees,

and

The Monterey County Emergency Medical
Service Agency; Robert Melton, M.D.;
Kim Donnelly; Albert Maldonado; Peninsula Paramedics, a California Corporation; Brian Sinnott, Defendants.

Nos. 94–16704, 94–16817.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 1996.

Decided May 7, 1996.

As Amended on Denial of Rehearing and
Rehearing En Banc July 31, 1996.*

* Judges Schroeder and Trott vote to reject the suggestion for rehearing en banc, and Judge Al-    disert so recommends.

William K. Rentz, Deputy County Counsel, Salinas, California, for defendant-appellant-cross-appellee.

Richard P. Hill, Moody & Hill, San Francisco, California; Eugene Dong, Palo Alto, California, for plaintiff-appellee-cross-appellant.

Stephen A. Lankes, Holbrook & Lankes, Salinas, California, for defendant-appellee.

Before: ALDISERT,** SCHROEDER and TROTT, Circuit Judges.

TROTT, Circuit Judge:

In this case we hold that, under the state action antitrust immunity doctrine, Emergency Medical Service (EMS) agencies in California may establish exclusive operating areas for Advanced Life Support (ALS) and limited ALS ambulance service, even if the restricted market includes non-emergency

** The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit Court of Appeals, sitting by designation.

ALS and limited ALS ambulance transportation between health care providers.[1] We decline to review Monterey County's claim that the district court erred in holding that the County's ambulance service rates violated constitutional limitations on ratemaking. We affirm the district court's grant of summary judgment for the City of Salinas on A–1 Ambulance Service, Inc.'s claim that the City violated the Takings Clause. Finally, we remand for recalculation of damages.

## I. State Action Antitrust Immunity

California's Emergency Medical Services System and the Prehospital Emergency Medical Care Personnel Act (EMS Act) permits counties to develop emergency medical services programs. Cal. Health & Safety Code §§ 1797–1799.200. Counties choosing to develop an EMS program must designate a local EMS agency which will have primary responsibility for the administration of emergency medical services in the county, including ambulance and paramedic services. Cal. Health & Safety Code §§ 1797.200, 1797.204. The EMS Act allows the local EMS agency to create one or more exclusive operating areas for "emergency ambulance services or providers of limited advanced life support or advanced life support". Cal. Health & Safety §§ 1797.85, 1797.224. Section 1797.6(b) explains that

> It is the intent of the legislature in enacting this section and Sections 1797.85 and 1797.224 to prescribe and exercise the degree of state direction and supervision over emergency medical services as will provide for state action antitrust immunity under federal antitrust laws for actions undertaken by local governmental entities in carrying out their prescribed functions under this division.

In 1988, the Board of Supervisors of Monterey County adopted an ordinance which contemplated the initiation of a competitive process to award ambulance service providers the exclusive right to provide service in selected areas of the County. Later, the Monterey County EMS agency developed a document entitled "Request for Proposals: Exclusive Emergency/Non–Emergency Ambulance Service, Greater Salinas Area" (RFP).

In the RFP, Monterey County asked ambulance service companies to submit proposals to provide ambulance service, including 911 responses (identified in the RFP as "emergency" transports) and interfacility transfers (identified in the RFP as "non-emergency" transports),[2] in the greater Salinas area. The successful bidder would be entitled to an exclusive operating area in which it would be the sole provider of all ambulance services—including both 911 responses and interfacility transfers—at the Advanced Life Support (ALS) level of care.

A–1 and a competitor both submitted proposals under the RFP. On March 10, 1989, before the proposals were opened, A–1 filed this action against Monterey County seeking, in part, to enjoin the RFP because it would grant an exclusive operating area for interfacility transfers. After a hearing, the district court issued a preliminary injunction preventing Monterey County from proceeding further with the RFP and from initiating any other RFP which included interfacility transfers in the exclusive operating area. This injunction was later made permanent. Because the district court's decision to grant the injunction rests on the interpretation of a state statute, we review *de novo. Palmer v. United States,* 945 F.2d 1134, 1135 (9th Cir. 1991).

Section 1 of the Sherman Act states: "Every contract, combination ... or conspiracy, in restraint of trade ... is declared to be illegal." 15 U.S.C. § 1. This law applies to local governments as well as individuals and businesses. *Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 408, 98 S.Ct. 1123, 1134, 55 L.Ed.2d 364 (1978). The

---

1. Nothing in this opinion should be read to imply that EMS agencies may establish exclusive operating areas for basic life support ambulance service.

2. The RFP defined "Non-emergency" as:

a condition or situation in which an individual has need for prearranged, non-urgent medical transportation between medical facilities, but not normally to an Emergency Department, Intensive or Coronary Care Unit.

County's RFP would restrain trade by allowing only one ALS ambulance service provider to operate in the Greater Salinas area on Monterey County. Hence, unless the County's RFP is not subject to Section 1, the Sherman Act prohibits the County from enforcing the RFP's terms.

■ The County argues that its actions in relation to the RFP are immune from the Sherman Act because of the state action immunity doctrine created in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Under this doctrine, a local government entity may restrict trade without violating the antitrust laws if the state has "clearly articulated" its intention to allow the municipality to replace competition with regulation or monopoly power. *City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 372, 111 S.Ct. 1344, 1349, 113 L.Ed.2d 382 (1991). To meet the "clearly articulated" requirement it is not necessary for the state to expressly permit the displacement of competition. Instead, it is only required that "suppression of competition is the foreseeable result of what the statute authorizes." *Id.* at 372–73, 111 S.Ct. at 1350.

A–1 argued, and the district court agreed, that the California Legislature only intended to provide state action antitrust immunity for the creation of exclusive operating areas for *emergency* ambulance services and not for non-emergency interfacility transfers, even if these interfacility transfers are performed at the ALS or limited ALS level of care. We disagree.

■ Section 1797.224 permits a local EMS agency to "create one or more exclusive operating areas" for ambulance service. "Exclusive operating area" is defined as an:

area or subarea defined by the emergency medical services plan for which a local EMS agency, upon the recommendation of a county, restricts operations to one or more emergency ambulance services or providers of limited advanced life support or advanced life support.

Cal. Health & Safety Code § 1797.85. A straightforward reading of §§ 1797.85 and 1797.224 leads us to the conclusion that the California Legislature intended to allow

EMS agencies to create exclusive operating areas for: (1) emergency ambulance services; (2) providers of limited advanced life support; and (3) providers of advanced life support.

On its face, therefore, the EMS Act appears to permit Monterey County to create exclusive operating areas for ALS ambulance service providers, even if the ALS ambulance service providers are engaged in non-emergency interfacility transfers. However, A–1 argues that "advanced life support" is limited to instances of "pre-hospital emergency care." We do not find this argument persuasive.

The relevant definition of advanced life support is contained in § 1797.52:

"Advanced life support" means special services designed to provide definitive prehospital emergency medical care, including, but not limited to, cardiopulmonary resuscitation, cardiac monitoring, cardiac defibrillation, advanced airway management, intravenous therapy, administration of specified drugs and other medicinal preparations, and other specified techniques and procedures administered by authorized personnel under the direct supervision of a base hospital as part of a local EMS system at the scene of an emergency, during transport to an acute care hospital, during interfacility transfer, and while in the emergency department of an acute care hospital until responsibility is assumed by the emergency or other medical staff of that hospital.

The ALS definition pertains to the level of service the ambulance provides during certain specified circumstances, including "during interfacility transfer," not the status of the patient that the ambulance transports. Therefore, even if an ambulance transports a patient who does not require emergency care, the ambulance is providing ALS service if it offers the "special services designed to provide prehospital emergency medical care" and is engaged in one of the activities listed in § 1797.52.

■ In short, we hold that the California Legislature intended to permit EMS agencies to create exclusive operating areas for providers of advanced life support and limit-

ed advanced life support, even when the transportation occurs during a non-emergency interfacility transfer. Therefore, state action antitrust immunity applies to Monterey County's RFP and, accordingly, we reverse the district court's permanent injunction against Monterey County.[3]

## II. The County's Failure to Properly Defend Its Ratemaking for Ambulance Service

In 1981, Monterey County adopted-and has since periodically updated-its Emergency Medical Service (EMS) ordinance. Under the County's EMS ordinance, all ambulance service providers must be licensed by the County. In addition, since 1988, no provider can operate within the County without a County contract. The EMS ordinance requires that the County Board of Supervisors set the maximum prices, known as the Uniform Maximum Emergency Service Rates (Uniform Rates), that may be charged by ambulance companies to the patients they transport.

Over the years, A–1 signed a series of contracts with the County whereby A–1 would provide Ambulance service to patients within the Greater Salinas area. In each of these contracts, A–1 explicitly or implicitly agreed to follow the Uniform Rates in exchange for the right to provide ambulance service. Throughout the relevant time period, A–1 was the only ambulance provider in the Greater Salinas Area, and starting in 1989, A–1's contract provided that it would be the area's exclusive provider.

The Uniform Rates were based, in part, on a survey of average ambulance rates throughout California. Neither the survey, nor any of the other procedural steps the County used to set the Uniform Rates considered the ambulance service providers' interest in making a profit.

Starting at least by April of 1988, A–1 began telling the County that the Uniform Rates were inadequate to cover A–1's costs.

Although the County did make occasional adjustments in the Uniform Rates, the increases were not enough to cover A–1's expenses. A–1 continued to provide ambulance service in its operating area, but had to borrow money to cover its operating costs.

A–1 brought this lawsuit against Monterey County claiming, among other things, that the County violated the Constitution and 42 U.S.C. § 1983 by setting the Uniform Rates too low. Following a bench trial, the district court agreed with A–1 and held that the County breached its constitutional obligations by not setting the Uniform Rates at a level which allowed A–1 to make a profit.

The district court reached this conclusion by relying on a line of cases which hold that in order for government ratemaking to be constitutionally acceptable, the rate must reflect a just and reasonable balance between the consumer interest in nonexploitative rates and the investor interest in maintaining a fair return on investment. *See e.g. Duquesne Light Co. v. Barasch,* 488 U.S. 299, 307, 109 S.Ct. 609, 615, 102 L.Ed.2d 646 (1989) ("[T]he Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory.").

Monterey County argues on appeal that district court's decision was incorrect because A–1 signed contracts with the County to provide service at the Uniform Rates, and that these contracts trump any constitutional ratemaking requirements (the contract argument). The County cites a number of cases for the proposition that when a public service company, such as A–1, enters into a binding contract to provide services at a specified rate, then the contract prevails and the constitutional issues disappear. *See Georgia Ry. & Power Co. v. Decatur,* 262 U.S. 432, 43 S.Ct. 613, 67 L.Ed. 1065 (1923) (discussed *infra* ); *St. Cloud Public Service Co. v. City of St. Cloud,* 265 U.S. 352, 355–56, 44 S.Ct. 492, 493, 68 L.Ed. 1050 (1924) ("[W]here a public service corporation and the municipali-

3. A–1 also argues that we can affirm the injunction on the ground that the County's board of supervisors, rather than the County's EMS agency, created the exclusive operating area. *See Memorial Hosp. Ass'n v. Randol,* 38 Cal.App.4th

1300, 45 Cal.Rptr.2d 547 (1995). However, this argument was abandoned by A–1 in its trial memo, and, as it appears not to be a purely legal issue, we will not consider it on appeal.

ty have power to contract as to rates, and exert that power by fixing the rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and the question of whether they are confiscatory is immaterial."); *Honolulu Rapid Transit Co. v. Dolim,* 459 F.2d 551 (9th Cir.) (discussed *infra* ), *cert denied,* 409 U.S. 875, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972).

For example, in *Georgia Ry. & Power Co.* the Supreme Court was presented with an agreement between a company and a town which limited the fare that the company could charge for streetcar service. The Court stated that because the contract was valid, "we are not concerned with the question whether the stipulated rates are confiscatory." 262 U.S. at 438–39, 43 S.Ct. at 616.

Our decision in *Honolulu Rapid Transit Co.* favors the County's contract argument. In *Honolulu,* the legislature of Hawaii granted a fifty-year monopoly to Honolulu Rapid Transit Co. (HRT). The franchise agreement provided that the City of Honolulu could purchase HRT's property at the end of the franchise period for a price that would not account for the value of HRT's good will or other intangible assets. Forty-nine years later, Honolulu began to make preparations to purchase HRT's assets at the contract price. HRT brought suit to declare the franchise agreement unconstitutional because "it provides for the taking of HRT's property without payment of just compensation." 459 F.2d at 552.

As A–1 does here, HRT argued that although the government had the right to refuse to grant the franchise, it could not exact a waiver of HRT's constitutional right to just compensation as a price of the grant. *Id.* This court rejected HRT's argument saying:

> HRT disregards the fact that there was here no "taking" by the City. This was not a unilateral exercise by the City of its power of eminent domain. The right of

the City to acquire HRT's property at a certain price was not based upon its power to take, but upon an agreement between the parties. Thus there was no event to which HRT's asserted constitutional rights attached. The transaction "passed out of the range of the Fifth Amendment" and was a situation where "Parties, supposedly with due regard to their own interests, bargain between themselves as to compensation."

*Id.* at 553 (quoting *Albrecht v. United States,* 329 U.S. 599, 603–04, 67 S.Ct. 606, 609, 91 L.Ed. 532 (1947)). Furthermore, the court held that the fact that HRT's alternatives to accepting the franchise ·agreement were unattractive did not render the agreement a coerced one. *Honolulu Rapid Transit,* 459 F.2d at 553. *See also Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1007, 104 S.Ct. 2862, 2875, 81 L.Ed.2d 815 (1984) (rejecting the argument that a company was forced into accepting an unconstitutional condition where the company was aware of the conditions and the conditions were rationally related to a legitimate government interest).

■ A–1 argues, however, that the County waived the contract argument by failing to raise it at trial. This argument has merit. Generally, in order for an argument to be considered on appeal, the argument must have been raised sufficiently for the trial court to rule on it. *In re E.R. Fegert, Inc.,* 887 F.2d 955, 957 (9th Cir.1989). The County points to a variety of instances in the record where it claims it raised the issue before the trial court.[4] However, nowhere in the record can we find an instance where the County argues, as it does quite ably in its appellate brief, that "[a] binding contract to limit rates eliminates any constitutional issues as to those rates." Nor did the County ever cite in the district court to the line of cases supporting its argument which it relies on here. Given the County's failure to make the highly persuasive contract argument, it is

---

4. The County cites to three instances in its 113 page post-trial brief in support of its contention that it raised the contract argument before the trial court: (1) a two page description of its contracts with A–1; (2) an argument that a contract right does not automatically create a constitutionally protected interest; and (3) an argument, in which the County cites to no pertinent cases, that "What plaintiff A–1 is attempting to do is to renegotiate its contract to provide service with an allegation that the rate of compensation is inadequate under the allegation of a taking without just compensation."

not surprising that the district court did not address the issue at all in its decision.

We have previously held that an issue not raised below might still be heard on appeal if the issue "is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed." *Bolker v. C.I.R.,* 760 F.2d 1039, 1042 (9th Cir.1985). However, review of such unraised issues is discretionary, not automatic. *Id.* Here, it is not clear that the contract argument is purely one of law: A–1 argues that if the County had made its contract argument clearer to the district court, A–1 would have raised all sorts of factual issues-primarily dealing with the validity of the contract-that would have changed the way the record was developed. After examining the record and the arguments, we cannot rule out the possibility that A–1 might be right and that the merits of the contract argument cannot be resolved without further hearings before the district court. Therefore, we lack the power to consider the contract argument in this appeal.

Moreover, even if we had the discretion to consider the contract argument, we would decline to do so here because the County is responsible for failing to raise both adequately and timely this argument in the district court. Accordingly, even though we believe that the district court employed the wrong methodology to resolve the issue, we affirm because the County is responsible for any errors committed by the district court and because it is now inappropriate for us to either approve or disapprove of a decision rendered on a manifestly inapplicable theory. To do so would require us to continue the mistake made in the district court.[5]

We recognize the effect of this holding on the County's position, but our system requires a defendant either to raise an obvious defense or to forgo its manifest benefits. The County's failure to identify the applicable law to the district court renders it impossible for us to put Humpty Dumpty back together again.

## III. The Prejudicial Effect of the District Court's Injunction on the Damages Period

The County asks us in the event that we affirm the district court on the ratemaking issue but reverse on the injunction, which we have done, to remand for the district court to consider the prejudicial effect, if any, of the injunction on the damages award. The County argues that A–1 requested the injunction and that any injuries that resulted from it were A–1's fault. Had the RFP not been enjoined, the court might have held that the RFP's rate setting provisions complied with constitutional limitations on ratemaking and limited the damages period to the time before the contracts under the RFP would have commenced. Therefore, A–1 and not the County should bear the costs of the improperly granted injunction.

A–1, of course, believes differently. It argues that the County could have changed its Uniform Rates even with the injunction. And in any event, A–1 claims it would have succeeded in obtaining the injunction on different grounds had the district court not originally ruled in its favor.

These might-have-held could-have-changed would-have-succeeded arguments can be addressed most appropriately by the district court. We realize that by remanding the issue of the prejudicial effect of the improperly granted injunction, we are directing the district court to decide the legality of the RFP in hypothetical circumstances. Howev-

---

5. A–1 has filed a cross appeal in this action, arguing that the district court erred by using after tax profits as a measure to calculate damages, and by *sua sponte* raising and applying an unpled defense of mitigation of damages to A–1's post 1990 damages. The County has conceded that the court erred by using after-tax profits to measure damages and so we remand the issue of damages to the district court for recalculation.

The County also agrees that it was improper for the district court to *sua sponte* limit A–1's damages for failure to mitigate. However, the County argues that after 1990 it did not violate constitutional limitations on ratemaking as interpreted by the district court. Although we are uncomfortable analyzing the issue under what we believe is an improper standard applied by the district court, the unique circumstances of this case cause us to agree with the County, and affirm the limitation of the damages period.

er, the district court is in a better position than we are to answer these questions and to determine in the light of our opinion what the appropriate period for measuring damages should be.

## IV. A–1's Takings Claim Against the City of Salinas

The City of Salinas (City) is an incorporated entity within the County of Monterey. For many years, the City has been a "first responder" agency through its fire department. As such, the City's fire fighters and emergency medical personnel are dispatched to all 911 calls throughout the city which might involve injuries. A–1 also responds to these same calls.

In compliance with the County's medical protocols, the County's base station hospitals decide which medical attendant on the scene will be primarily responsible for the patient during transit. When the base station directs the City's paramedic to remain in charge, A–1's contract and the County's medical plan require that A–1 provide transportation for the City's paramedic and the patient, as well as any necessary equipment or supplies. In such situations, A–1 charges the patient the full price for the ambulance service and the City charges nothing.

A–1's claim against the City is that the City's actions violate the Takings Clause of the Fifth Amendment (which is applicable to the States through the Fourteenth Amendment) because the City did not pay A–1 for its use of A–1's equipment. The City moved for summary judgment on this claim, which the district court granted without explanation. We review *de novo, Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995), *cert denied,* —— U.S. ——, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996), and affirm.

The City argues that its paramedics only used A–1's ambulances and equipment if they were required to do so under the County's medical protocols, and therefore A–1 may only bring claims against the County and not the City. We agree. Although A–1 claims that the City should have paid for its use of A–1's ambulance and equipment, the City's use of the equipment was provided for

in A–1's contract with the County, as was A–1's compensation for this use. Therefore, if the amount of compensation is inadequate, A–1 is limited to bringing a claim against the County and not the City.

## V. Conclusion

We reverse the permanent injunction prohibiting the County of Monterey from creating exclusive operating areas for non-emergency ALS and limited ALS medical transportation. The district court's grant of summary judgment in favor of the City of Salinas is affirmed as is the judgment in favor of A–1 on its takings claim against the County. We remand the calculation of A–1's damages to the district court for re-calculation using before-tax profits. We also remand the damages award for the district court to determine whether the improperly granted injunction prolonged the damages period.

**County of Monterey will bear the costs of the appeal. A–1 will bear the costs of the cross-appeal.**